In the MATTER OF GREATE BAY HOTEL & CASINO, INC.; GB Holdings, Inc., and GB Property Funding Corporation, Debtors.

Nos. 98–10001/JHW, 98–10002, 98–10003.

United States Bankruptcy Court,
D. New Jersey.

July 28, 2000.

Edward S. Weisfelner, Andrew Dash, Rachel Myerson, Berlack, Israels & Liberman, New York City, for High River.

Michael Chertoff, James Brandt, A. Brent Truitt, Latham & Watkins, New York City, for Park Place Entertainment Corp.

Joseph Markowitz, Markowitz, Gravelle & Schwimmer, Lawrenceville, NJ, for Park Place Entertainment Corp.

Eric A. Browndorf, Cooper Perskie April Niedelman, Wagenheim & Levenson, Atlantic City, NJ, for Official Committee of Unsecured Creditors.

James Lawlor, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, Newark, NJ, for Debtors.

Frederick H. Kraus, Greate Bay Hotel & Casino, Inc., Atlantic City, NJ, General Counsel for Debtors.

Stephen F. Gordon, Gordon & Wise, Boston, MA, for Las Vegas Sands, Inc.

Dov Kleiner, David Bryan, Wachtell, Lipton, Rosen & Katz, New York City, for Merrill Lynch Asset Management.

Jack Zackin, Sills, Cummis, Radin, Tischman, Epstein & Gross, Newark, NJ, Co–Counsel for Merrill Lynch Asset Management.

Arthur Abramowitz, Cozen & O'Connor, Cherry Hill, NJ, for Greate Bay Casino Corporation.

Robert D. Albergotti, Stacey Jerrigan, Haynes & Boone, Dallas, TX, Co–Counsel for Greate Bay Casino Corp. and Co–Counsel for Greate Bay Holdings LLC.

Jeffrey Kurtzman, Klehr, Harrison, Harvey, Branzburg & Ellers, Cherry Hill, NJ, for Greate Bay Holdings LLC.

Kevin Callahan, Richard Schepacarter, Office of United States Trustee, Newark, NJ, trustee.

Richard Heirsteiner, Palmer & Dodge, Boston, MA, for State Street Bank & Trust Company.

Richard M. Meth, Herrick, Feinstein, Princeton, NJ, for State Street Bank & Trust Company.

Mala Narayanan, Deputy Attorney General R.J., Trenton, NJ, for State of New Jersey, Division of Taxation.

### AMENDED OPINION ON CONFIRMATION

JUDITH H. WIZMUR, Bankruptcy Judge.

Before the court for consideration are two competing plans of reorganization, the Park Place Entertainment Corporation plan and the High River plan, filed jointly with the Official Committee of Unsecured Creditors. For the reasons expressed herein, I conclude that both plans are confirmable, and that the High River plan will be confirmed.

### FACTS AND PROCEDURAL HISTORY

On January 5, 1998, Greate Bay Hotel and Casino, Inc. ("GBHC"), GB Holdings, Inc. ("Holdings"), and GB Property Funding Corporation ("Funding") filed separate voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. GBHC, a New Jersey corporation and wholly-owned subsidiary of Holdings, a Delaware corporation, is the owner of the Sands Hotel & Casino, located in Atlantic City, New Jersey, and is licensed to conduct the gaming business of the Sands. Funding is also a wholly-owned subsidiary of Holdings, incorporated for the special purposes of borrowing funds, through the issuance of certain mortgage notes, and of loaning the proceeds to GBHC. The sole asset of Funding is the intercompany note payable from GBHC, representing the proceeds of the notes which were loaned to GBHC. Holdings is a 79% owned, indirect subsidiary of the Greate Bay Casino Corporation ("GBCC"). Holdings' sole material asset is its stock in its subsidiaries.

As of the petition date, the debtors' largest indebtedness was in the form of certain 10-⅞% First Mortgage Notes due January 15, 2004, issued by Funding in September 1993, and guaranteed by GBHC and Holdings, in the original principal amount of $185,000,000 ("Old Notes"). State Street Bank and Trust Company is the successor trustee under the Indenture. As of the date of filing, $182,500,000 in principal plus accrued interest of $9,372,000 were outstanding on the Old Notes. Post petition payments reduced the principal balance to $181,972,000. High River, representing the interests of Carl Icahn, holds approximately $62,833,000 (or 34.4%) of the Old Notes. Merrill Lynch Asset Management, L.P. and its affiliate Fund Asset Management, L.P. (collectively, "MLAM"), own approximately $70.2 million (38.5%) of the Old Notes. Park Place holds approximately $26.4 million (14.5%) of the Old Notes. The Old Notes were not in default as of the petition date.

Additional pre-petition indebtedness of the combined debtors includes approximately $6.7 million of general unsecured debt, and two Subordinated Promissory

Notes ("Intercompany Notes") executed by GBHC, with an aggregate amount due as of the petition date of $15 million in principal, and approximately $3.5 million in interest. Repayment of the Intercompany Notes, now due to Greate Bay Holdings, LLC ("GBHLLC"), is made subordinate to the payment in full of the Old Notes.

The subject property, the Sands Hotel and Casino, is one of twelve operating casinos in Atlantic City, New Jersey. The Sands is located on approximately 4.8 acres of land, one-half block from the boardwalk. The Sands consists of a casino and simulcasting facility, which contains approximately 2,000 slot machines and 125 table games; a hotel with 532 rooms, six restaurants, two cocktail lounges and two private lounges; an 800–seat cabaret theatre; retail space; an adjacent nine-story executive building; a "People Mover", an elevated, enclosed, one-way moving sidewalk connecting the Sands to the boardwalk, and parking for about 1,750 vehicles.

The debtors continue to operate their businesses and manage their properties pursuant to sections 1107(a) and 1108 of the Bankruptcy Code as debtors-in-possession. After several extensions, the debtors' exclusivity period in which to file a plan of reorganization terminated on January 11, 1999. The debtors continued to attempt to attract interest from outside sources to propose a plan, and continued to seek consensus among the bondholders, including MLAM and Icahn, regarding a plan framework.

The debtors filed their first joint plan of reorganization and disclosure statement on June 1, 1999. After several revisions, the third modified disclosure statement was approved on October 4, 1999. The balloting deadline was set for November 19, 1999, and confirmation was scheduled for December 17, 1999.

Under debtors' stand-alone plan, the creditors and shareholders were divided into seven classes. Class 2, the Old Notes, would receive $80 million of New Notes, bearing interest at 10%, and would receive all of the equity of the reorganized debtors, in the form of 10 million shares of the New Common Stock. Class 3, consisting solely of a $400,000 secured claim held by Ruth Lubin, would be treated by either payment in full, deferred cash payments, surrender of the collateral, or in accordance with an anticipated agreement between the debtor and the creditor. Class 4, the general unsecured claimants, would receive payments over the course of five years, amounting to a present value dividend of approximately 40%. Three other classes, those of Intercompany Notes, Subordinated Claims, and Old Common Stock, would not receive a distribution under the plan and were deemed to have rejected the plan.

Debtors' stand-alone plan was supported by High River, but was opposed by MLAM for various reasons, including the prospect that the distribution to Old Noteholders of all the equity of the reorganized debtors would cause MLAM to hold approximately 38% of the newly issued shares of stock. MLAM, as an institutional investor in gaming securities, may not hold more than 10% of the shares of stock of a gaming enterprise in the State of New Jersey without licensure or exemption. N.J.S.A. 5:12–85(f). MLAM, as a non-operational investor, did not intend to seek licensure in New Jersey for casino ownership, and believed that the limitation on equity ownership for institutional investor exemption by the Casino Control Commission was approximately 20%. MLAM determined to seek another plan proponent, and succeeded, in October 1999, in interesting Park Place in becoming such a proponent.

On October 22, 1999, MLAM and Park Place agreed that Park Place would purchase at least $25 million of Old Notes on the open market, and would be the proponent of a plan. The Park Place plan contemplated the issuance of New Notes worth $120 million, and the purchase of 51% of the equity of the reorganized debt-

or for $30 million. Old Noteholders would receive the remaining 49% of the equity. A management contract in favor of Park Place was included, with a minimum annual fee of $2 million, plus an incremental incentive schedule based on EBITDA (earnings before income, taxes, depreciation and amortization). MLAM agreed to write the indenture, while Park Place agreed to write the governance provisions. MLAM agreed to sell, and Park Place agreed to purchase, all of the equity MLAM would otherwise receive under the plan.

The agreement between Park Place and MLAM was subsequently revised to provide for the issuance to Old Noteholders of $128 million in New Notes, plus 42.308% of the equity interests in the reorganized debtors. The exchange option, to which MLAM agreed to be bound, offered to Old Noteholders the opportunity to exchange shares of stock for new notes at the rate of $3.61 per share.[1] Park Place increased the percentage of equity it would acquire in exchange for its cash contribution of $30 million to 57.692% in order to achieve a minimum equity position in the reorganized debtors of 80%, the percentage needed to insure inclusion of the reorganized debtors on Park Place's consolidated financial statement.

On November 3, 1999, counsel for MLAM conveyed the basic terms of the proposed Park Place plan to the debtors, requesting the debtors' support for the plan. The debtors responded by seeking and obtaining from the court a suspension of the balloting process and confirmation hearings on their stand-alone plan, then scheduled for December 17, 1999, to allow the debtors to engage in a due diligence process. During that process, the debtors successfully encouraged the participating parties, particularly the Icahn Group and

Park Place, to engage in a bidding process to maximize the return to the estate. When it became apparent that competing plans would be submitted by High River, on behalf of the Icahn Group, and by Park Place, the proponents were directed to file plans and disclosure statements by January 18, 2000, which they did. The debtors were also directed to file a master disclosure statement, which was also provided. Following several revisions, the three disclosure statements were approved and forwarded to the creditor body.[2]

Logan & Company, Inc., appointed by this court on March 24, 1998, acted as the solicitation agent for the debtors for the purposes of receiving and tabulating the ballots for the two competing plans. The creditors were offered the option to vote in favor of both plans, and to specify which plan each such creditor preferred. The voting results are appended hereto as Schedule A.

Under 11 U.S.C. § 1126(c), "A class of claims has accepted a plan if such plan has been accepted by creditors . . . that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class." Neither proponent received sufficient accepting votes for their plan from the Class 2 Old Noteholders. The High River plan was accepted by the Class 4 general unsecured claimants, and the Park Place plan was accepted by the sole Class 3 claimant, Ruth Lubin, and the Class 5 Intercompany Noteholders.

### DISCUSSION

■ Our starting point is to determine whether either or both of the plans as presented are confirmable. The requirements for confirmation of a proposed Chapter 11 plan are listed in 11 U.S.C.

---

1. Scott LaPorta, Chief Financial Officer of Park Place, testified that the exchange rate agreed to by MLAM was intended to equalize the fact that Park Place had to pay more to acquire the bonds, as a percentage of par, than MLAM did.

2. High River filed a Modified Fifth Amended Joint Plan on June 16, 2000, making several non-material and/or technical changes. Similarly, Park Place filed its Modified Fourth Plan on July 5, 2000. Both amendments were accepted without objection.

§ 1129. The proponent bears the burden of establishing the plan's compliance with each of these requirements. *In re Gulfstar Indus., Inc.*, 236 B.R. 75, 77 (M.D.Fla. 1999). Creditors objecting to the proposed plan bear the burden of producing evidence to support their objection. *In re Shortridge*, 65 F.3d 169, 1995 WL 518870 (6th Cir.1995) (Unpublished opin.); *In re Goddard*, 212 B.R. 233, 239 n. 7 (D.N.J. 1997). The Code imposes an independent duty upon the court to determine whether a plan satisfies each element of § 1129, regardless of the absence of valid objections to confirmation. *In re Bolton*, 188 B.R. 913, 915 (Bankr.D.Vt.1995); *In re Shadow Bay Apartments, Ltd.*, 157 B.R. 363, 365 (Bankr.S.D.Ohio 1993).

■ A consensual plan requires the proponent to demonstrate that the plan satisfies all thirteen elements of section 1129(a), in which case the plan must be confirmed. *Beal Bank, S.S.B. v. Waters Edge L.P.*, 248 B.R. 668 (D.Mass.2000). A nonconsensual plan requires the proponent to prove all but one of the thirteen elements, that all classes consent or are unimpaired, 11 U.S.C. § 1129(a)(8), plus the additional requirements of section 1129(b), including the requirements that the plan does not unfairly discriminate against dissenting classes and that treatment of such dissenting classes is fair and equitable. Both plans in this case are nonconsensual.

We will address each of the requirements of section 1129(a) and (b) with respect to each plan. As a threshold matter, we note that there is no challenge to the compliance by both competing plans with subsections 1129(a)(4) (court approval of payments)[3]; (a)(5) (disclosure of management)[4]; (a)(6) (rate of approval)[5]; (a)(7) (best interest of creditors test)[6]; (a)(9) (treatment of priority claims)[7]; (a)(12) (28 U.S.C. § 1930 fees); and (a)(13) (retiree benefits). We note as well that the objections filed by GBCC against the High River plan, and by Las Vegas Sands, Inc. against the Park Place plan, in connection with the Sands Trademark, have been resolved amicably among all parties.

■ Both the High River and Park Place plans contain non-debtor release clauses that have been objected to by the United States Trustee as violative of 11 U.S.C. § 524(e).[8] The plan proponents contend that the exculpation provisions are permissible and fully consistent with current case law.

■ Section 524(e) provides that a debtor's discharge does not, by itself, serve to discharge non-debtor third parties of their liabilities. *Copelin v. Spirco, Inc.*, 182 F.3d 174, 182 (3d Cir.1999); *First Fidelity Bank v. McAteer*, 985 F.2d 114, 118 (3d

---

**3.** The Park Place plan has been amended to reflect that any fees and expenses sought to be paid from the estate for the benefit of either Park Place or MLAM must be subjected to notice and court approval.

**4.** Although High River contends that Park Place has failed to properly disclose its proposed management team, a list of the designated Board of Directors has been filed, and a potential General Manager has been identified at trial. The disclosure is sufficient for (a)(5) purposes.

**5.** Subsection (a)(6) is not applicable in this case.

**6.** The liquidation analysis performed by the debtors, appending to the debtors' Second Modified Master Disclosure Statement as Exhibit A, was adopted by both plan proponents and is accepted here to establish that, under either plan, each nonconsenting creditor will receive an amount greater than the amount they would receive in a Chapter 7 liquidation.

**7.** The State of New Jersey resolved its concern with both plans at the commencement of confirmation hearings. The State will file a claim, with the opportunity of the debtor or the successful proponent to contest the claim in the normal course. The claim will be paid ten days after the effective date of the plan. The issue of the starting point for the calculation of interest is preserved to offer the parties the opportunity to resolve the issue amicably.

**8.** Section 524(e) of the Bankruptcy Code states that "discharge of a debt of the debtor does not affect the liability of any other entity on . . . such debt." 11 U.S.C. § 524(e).

Cir.1993). Simply put, the "Bankruptcy Code does not explicitly authorize the release and permanent injunction of claims against non-debtors." *In re Continental Airlines*, 203 F.3d 203, 211 (3d Cir.2000). In reviewing decisions from other circuits,[9] the Third Circuit, in *Continental Airlines*, reflected, without establishing a "blanket rule", that even "the most flexible tests for the validity of non-debtor releases" look to certain "hallmarks of permissible non-consensual releases—fairness, necessity to the reorganization, and specific factual findings to support these conclusions." 203 F.3d at 214.

Here, as in *Continental Airlines*, the proponents have failed to establish any basis to support the fairness or necessity of the non-debtor releases. The exculpation clauses are legally insupportable, and must be stricken. The objection of the United States Trustee is sustained. The exculpation provisions contained in the Park Place plan (12.2, 12.4, 12.5) and the High River plan (12.02) are invalidated and shall be severed from their respective plans. Both plans contain severance clauses which leave other provisions of the plan unaffected if a provision is invalidated.[10]

We turn now to consideration of the provisions of each plan, and the § 1129 elements that remain to be resolved.

## I. *The High River Plan.*

The High River plan is presented on behalf of the Cyprus L.L.C. and the Larch L.L.C., recently formed limited liability corporations in Delaware, hereinafter referred to collectively as "High River". Cyprus is owned by the Starfire Holding Corporation and the Barberry Corporation, each of which is wholly owned by Carl C. Icahn. Larch is also wholly owned by Mr. Icahn. Collectively High River holds approximately $62,833,000 (or 34.4%) of the "Old Notes".

Mr. Icahn is an active owner and investor in various businesses, including several gaming entities. Mr. Icahn's related entities own and operate the Stratosphere Hotel and Casino and Arizona Charley's Inc., both located in Las Vegas, Nevada. Mr. Icahn's related entities also hold approximately $34 million (or 40%) of the bonds of the Claridge at Park Place, Inc., as well as other gaming interests. Mr. Icahn has a personal net worth in excess of $1 billion, and confirms that he will provide adequate funding of Cyprus and Larch to consummate the High River plan.

To fund the High River plan, High River proposes to buy 46.25% of the New Common Stock for $65 million in cash. The

---

**9.** The Fifth, Ninth and Tenth Circuits follow a strict interpretation of 524(e) and do not permit non-debtor releases and permanent injunctions. *See, e.g., In re Lowenschuss*, 67 F.3d 1394, 1401 (9th Cir.1995), *cert. denied*, 517 U.S. 1243, 116 S.Ct. 2497, 135 L.Ed.2d 189 (1996) ("This court has repeatedly held without exception, that § 524(e) precludes bankruptcy courts from discharging the liabilities of non-debtors."); *In re Zale Corp.*, 62 F.3d 746, 760 (5th Cir.1995) ("[A] temporary stay prohibiting a creditor's suit against a nondebtor ... may not be extended post-confirmation in the form of a permanent injunction that effectively relieves the nondebtor from its own liability to the creditor."); *In re Western Real Estate Fund, Inc.*, 922 F.2d 592, 600 (10th Cir.1990), *modified by, Abel v. West*, 932 F.2d 898 (10th Cir.1991). In contrast, the Second and Fourth Circuits allow some flexibility in cases that involve mass litigation and in which there is some consideration to the claimants in exchange for non-debtor re-

leases. *See, e.g., In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 293 (2d Cir. 1992), *cert. dismissed*, 506 U.S. 1088, 113 S.Ct. 1070, 122 L.Ed.2d 497 (1993) ("[A] court may enjoin a creditor from suing a third party, provided the injunction plays an important part in the debtor's reorganization."); *In re A.H. Robins Co.*, 880 F.2d 694, 702 (4th Cir.), *cert. denied*, 493 U.S. 959, 110 S.Ct. 376, 107 L.Ed.2d 362 (1989) ("[W]e do not think that [§ 524(e) ] must be literally applied in every case as a prohibition on the power of the bankruptcy courts."). The Seventh Circuit follows the view that a bankruptcy court can release a non-debtor from liability only with the consent of the affected creditor. *In re Specialty Equip. Cos.*, 3 F.3d 1043, 1047 (7th Cir.1993).

**10.** See Section 12.20 of the High River plan, and Section 12.21 of the Park Place plan.

infusion of new capital will be used to consummate the plan and to implement the debtors "Global Development Plan 2000–2002". That plan envisions, among other things, the development of a hotel tower with 200 new rooms, additional casino space and 800 additional slot machines. Under the High River plan, the Old Noteholders will receive a pro rata portion of $110 million in New Notes and 5,375,000 shares of New Common Stock (after the effect of the subordination of the Intercompany Notes). The shares of New Common Stock to be distributed to Old Noteholders represent 53.75% of the equity in the reorganized debtors. The general unsecured claims will receive between 80% and 100% of their allowed claims, depending upon the value to be received by the Old Noteholders on their unsecured deficiency claims. The secured claim of Ruth Lubin is treated in the same manner as in debtors' stand-alone plan.[11] Intercompany Note claims, other subordinated claims, and Old Common Stock interests, which will be cancelled and extinguished, receive no distributions under the plan and are therefore deemed to have rejected the plan. 11 U.S.C. § 1126(g).

No contest has been raised regarding the compliance by High River with § 1129(a)(2) (proponent's compliance with applicable Title 11 provisions); (a)(3) (good faith of the plan), and (a)(10) (acceptance by impaired class),[12] and I conclude that the High River plan meets these requirements. I will review the sections in dispute, including § 1129(a)(1), (a)(11) and § 1129(b).

A. *Section 1129(a)(1).*

Section 1129(a)(1) provides that:

The court shall confirm a plan only if all of the following requirements are met:

(1) The plan complies with the applicable provisions of this title.

11 U.S.C. § 1129(a)(1).

The phrase "applicable provisions" is not defined. The legislative history reflects that "the applicable provisions of chapter 11 [includes sections] such as section 1122 and 1123, governing classification and contents of plan." H.R.Rep. No. 595, 95th Cong., 2nd Sess. 412 (1977), U.S.Code Cong & Admin.News 1978 pp. 5963, 6368; S.Rep. No. 989, 95th Cong., 2d Sess. 126 (1978), U.S.Code Cong & Admin.News 1978 pp. 5787, 5912. *See In re Aspen Limousine Serv., Inc.,* 193 B.R. 325, 340 (D.Colo.1996); *In re Texaco Inc.,* 84 B.R. 893, 905 (Bankr.S.D.N.Y.), *appeal dismissed,* 92 B.R. 38 (S.D.N.Y.1988). Two objectors to the High River plan, Merrill Lynch and GBHLLC, have expressed classification concerns.

■ Merrill Lynch claims that High River has improperly classified the deficiency claims of Old Noteholders by placing both the secured and unsecured deficiency portions of the Old Noteholder's claims in the same class (Class 2), and the claims of the trade creditors in a separate unsecured class (Class 4).

Section 1123(a)(1) and (a)(4) mandate, in pertinent part, that "a plan shall—designate, subject to section 1122 of this title, classes of claims," and shall "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment." Section 1122(a) permits the placement of a claim or interest in a particular class "only if such claim or interest is substantially similar to the other claims or interests of such class." Neither section addresses the opportunity to separately classify similar claims.

---

11. At confirmation, the treatment of Ruth Lubin's secured claim was modified to provide for the curing of pre-petition default and reinstatement, to leave it unimpaired under the High River plan. 11 U.S.C. § 1124(2).

12. Class 4, comprised of general unsecured creditors, has voted to accept the High River plan, in conformance with the requisite formula for acceptance by a class. 11 U.S.C. § 1126(c).

While most courts agree that a proponent has "considerable discretion to classify claims and interests according to the facts and circumstances of the case." *In re Holywell Corp.,* 913 F.2d 873, 880 (11th Cir.1990), that discretion is tempered by the caveat that a proponent may "not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan." *In re Briscoe Enters., Ltd., II,* 994 F.2d 1160, 1167 (5th Cir.), *cert. denied,* 510 U.S. 992, 114 S.Ct. 550, 126 L.Ed.2d 451 (1993). *See also In re Boston Post Road L.P.,* 21 F.3d 477 (2d Cir.1994), *cert. denied,* 513 U.S. 1109, 115 S.Ct. 897, 130 L.Ed.2d 782 (1995); *In re Lumber Exch. Bldg. L.P.,* 968 F.2d 647, 650 (8th Cir.1992) (affirming, as improper, separate classification that was "a thinly veiled attempt to manipulate the vote to assure acceptance of the plan by an impaired class and meet the requirements of 11 U.S.C. § 1129(a)(10)"); *In re Daly,* 167 B.R. 734, 736 (Bankr.D.Mass.1994 ) (finding impaired claim "was plainly contrived and engineered solely to create an accepting impaired class"); *In re 11,111, Inc.,* 117 B.R. 471, 476 (Bankr.D.Minn.1990) (acknowledging "potential for abuse when the debtor has the power to classify creditors in a manner to assure that at least one class of impaired creditors will vote for the plan, thereby making it eligible for the cram down provisions"); *In re Club Assocs.,* 107 B.R. 385, 401 (Bankr.N.D.Ga. 1989) (disallowing "[a]n alteration [that] is clearly intended only to create an impaired class to vote in favor of a plan so that a debtor can effectuate a cramdown").

Some courts have been receptive to "good business reasons to support separate classification. The determination of 'whether there were any good business reasons to support the debtor's separate classification is a question of fact.' " *In re New Midland Plaza Assocs.,* 247 B.R. 877, 893 (Bankr.S.D.Fla.2000) (quoting *In re Greystone III Joint Venture,* 948 F.2d 134, 141 n. 7 (5th Cir.1991)).

Separate classification of similar claims has been found to be permissible where the classification is offered in good faith, does not foster an abuse of the classification system, and promotes the rehabilitative goals of Chapter 11. *In re 11,111, Inc.,* 117 B.R. at 476 (finding that "§ 1122 authorizes flexibility in classification consistent with· the rehabilitative purposes of chapter 11"); *In re Meadow Glen, Ltd.,* 87 B.R. 421, 425 (Bankr.W.D.Tex.1988) (permitting separate classification that is "fair and equitable, non-discriminatory, ... in 'good faith' " or "not an abuse of classification system").

The question of separate classification of similar claims has been addressed by the Third Circuit Court of Appeals in *John Hancock Mutual Life Insur. Co. v. Route 37 Business Park Assocs.,* 987 F.2d 154, 158 (3d Cir.1993) and *In re Jersey City Medical Center,* 817 F.2d 1055 (3d Cir. 1987). In *Route 37,* the unsecured deficiency claim of the mortgagee was classified separately from other unsecured debt. The plan called for identical payments to each of the two classes of unsecured claims of 5% of their claims payable over two years. The court invalidated the classification scheme as an improper gerrymandering of the creditor class with no valid justification. Nevertheless, the Court confirmed the *Jersey City Medical Center* holding that a plan may place similar claims in separate classes, if the classification is reasonable, *Id.,* subject to a reasonableness assessment that is "informed by the two purposes that classification serves under the Code: voting to determine whether a plan can be confirmed and treatment of claims under the plan." *Id.* at 159.

Thus, where, ... the sole purpose and effect of creating multiple classes is to mold the outcome of the voting, it follows that the classification scheme must provide a reasonable method for counting votes. In a "cram down" case, this means that each class must represent a voting interest that is sufficiently dis-

tinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed. Otherwise, the classification scheme would simply constitute a method for circumventing the requirement set out in 11 U.S.C. § 1129(a)(10).

*Id.*

In this case, there is a vastly different factual landscape than was presented in *Route 37*. In contrast to the identical treatment of the deficiency claimants and the other general unsecured creditors in *Route 37*, in the form of cash payments over time, here, the Old Note Holders are receiving a package of securities, including debt and equity, while the general unsecured creditors are receiving cash on the effective date of the plan. The business justification for the disparate treatment is readily apparent. The only opportunity of a proponent to offer the entire enterprise value of the debtors to the deficiency claimants, holding claims of over $80 million, is to offer them the equity in the reorganized debtor. In contrast, the cash payout to unsecured creditors contemplated by the plan to unsecured creditors, holding claims totaling approximately $6.7 million, is achievable and in line with the expectations of all parties in interest.

It must be recalled that the High River classification scheme to which MLAM objects is the identical scheme utilized in the debtors' stand-alone plan, and in each of the competing plans. The scheme was initially formulated by the debtors when they first presented their stand-alone plan in June 1999.[13] When MLAM succeeded, in October 1999, in soliciting Park Place's interest in proposing a plan, MLAM agreed to draft the plan of reorganization for Park Place. The classification scheme employed by MLAM for the Park Place

plan is the same classification scheme to which they now object. At the time the competing plans of Park Place and High River were submitted, Park Place and MLAM were confident that the Class 4 general unsecured creditors, many of whom were vendors who provided goods and services to Park Place's other Atlantic City properties, would either vote to accept the Park Place plan and to reject the High River plan, or would be deadlocked, potentially leaving the High River plan without an accepting impaired class for § 1129(a)(10) purposes. In that context, MLAM's plan for Park Place simply adopted the debtors' previous classification formulation, as did High River.

MLAM's objection to the High River plan, with the underlying suggestion that the scheme was engineered solely to mold or manipulate the outcome of the voting or otherwise improperly gerrymander the voting process, cannot be sustained. There should be no question that the voting interest of the Old Noteholders as a whole, versus the voting interest of the trade creditors, are "sufficiently distinct and weighty to merit a separate voice" in these proceedings. *Id.* 987 F.2d at 159.

■ GBHLLC, which now holds the Class 5 Intercompany Notes, also objects to the High River plan, contending that the plan improperly classifies the Class 5 claims separately from Class 4 general unsecured creditors. The High River plan proposes to allocate 995,079 shares of New Common Stock to Class 5 Intercompany Notes, which would then be distributed to holders of the Old Notes pursuant to applicable subordination agreements between GBHLLC and the debtors. In pertinent part, the subordination agreements contained in the promissory notes evidencing

---

**13.** MLAM objected to many aspects of the debtors' plan at the disclosure statement stage, including the debtors' classification scheme, and preserved their objection through confirmation. Nevertheless, MLAM acknowledges that its primary concern with regard to the debtors' plan was the prospect that MLAM would receive approximately 38% of the equity of the reorganized debtor, potentially requiring MLAM licensure by the Casino Control Commission, which MLAM could not pursue in light of its posture as "purely [an] investor[ ]", and the proscription in its prospectus against such involvement.

the debtors' indebtedness provide that the holders of the Old Notes "shall be entitled to receive payment in full of all amounts due ... before Lender [now GBHLLC] is entitled to receive any payment on account of this Note" and that the Old Noteholders are entitled to receive "any payment or distribution ... which may be payable or deliverable in respect of this Note."

A contractual subordination agreement is enforceable in bankruptcy "to the same extent that such agreement is enforceable under applicable nonbankruptcy law." 11 U.S.C. § 510(a). *See In re Southeast Banking Corp.*, 156 F.3d 1114, 1121–22 (11th Cir.1998) (section 510(a) requires subordination agreements to be enforced on par with other nonbankruptcy contracts). Enforcement of the subordination agreement in the context of the High River plan mandates that the proposed distribution on account of the Intercompany Notes be added to the distribution to be received by Class 2 Old Noteholders.

As reflected above, section 1122(a) permits the placement of a claim or interest in a particular class "only if such claim or interest is substantially similar to the other claims or interests in that class." 11 U.S.C. § 1122(a). The Intercompany Notes are not substantially similar to Class 4 general unsecured claims, because no distribution can be received by the Intercompany Noteholders prior to payment in full of the Old Notes.[14] The High River plan will not satisfy the Old Noteholders in full. The classification scheme, treating Class 5 Intercompany notes separately, is proper.

I conclude that the High River plan complies with § 1129(a)(1).

B. *Section 1129(a)(11).*

Section 1129(a)(11) requires a demonstration by the proponent of a plan that:

Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11).

▮ This section imposes a "feasibility" requirement for confirmation. Although the standards for determining feasibility are not rigorous, *In re Orfa Corp. of Philadelphia*, 129 B.R. 404, 410 (Bankr. E.D.Pa.1991), the court is obligated to independently evaluate the plan and determine whether it offers a reasonable probability of success. *In re Monnier Bros.*, 755 F.2d 1336, 1341 (8th Cir.1985); *In re Sovereign Oil Co.*, 128 B.R. 585, 586 (Bankr.M.D.Fla.1991).

▮ The proponent must present evidence to sufficiently demonstrate that the plan has a reasonable chance of succeeding. *In re Acequia, Inc.*, 787 F.2d 1352, 1364 (9th Cir.1986). "Guaranteed success in the stiff winds of commerce without the protections of the Code is not the standard under [this section].... All that is required is that there be a reasonable assurance of commercial viability." *In re Prudential Energy Co.*, 58 B.R. 857, 862 (Bankr.S.D.N.Y.1986).

▮ One court listed several factors to consider in determining whether a plan is feasible. They include:

(1) the adequacy of the debtor's capital structure;

(2) the earning power of its business;

(3) economic conditions;

(4) the ability of the debtor's management;

(5) the probability of the continuation of the same management; and

---

14. GBHLLC's reference to the Section 10 provision in the subordination agreement that "[a]ll payments due under this Note ... are intended to rank equally with all other general obligations of" GBHC, neglects to note that the "equal rank" provided for is subject to the rights of the Old Noteholders.

(6) any other related matters which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

*In re Temple Zion,* 125 B.R. 910, 915 (Bankr.E.D.Pa.1991); *In re Landmark at Plaza Park, Ltd.,* 7 B.R. 653, 659 (Bankr. D.N.J.1980).

■ As to the High River plan, all of the experts who testified agreed that the initial capitalization of the debtor, including $65 million of cash and $110 million of debt, offers a reasonable capital structure as a basis for the debtor's financial prospects going forward. The cash available for capital improvements and the relatively low debt are particularly important for the Sands, which has been "a relatively underprivileged property in terms of capital improvements" in the Atlantic City environment, in which capital improvements are critical. The anticipation of significant development in Atlantic City requires significant investment in the property to maintain a competitive role. The cash infusion proposed by the High River plan provides that opportunity.

As to the earning power of the reorganized debtors under the High River plan, the debtors revised their projections for performance in the year 2000 in January, 2000. These projections, contemplating the achievement of an EBITDA of $32.473 million dollars,[15] appear to be achievable. The debtors' Chief Executive Officer, Alfred J. Luciani, a highly experienced casino operator who came to the Sands in November 1999, testified that the debtors are ahead of projections on an operating basis and on budget on a gross basis. The projections were prepared in January 2000 based upon the implementation of certain cost savings initiated by the new CEO, including the consolidation of mailings, cost controls with regard to certain purchases and revision of the entertainment program to reduce risks. Notwithstanding the disruption of the recent construction of a new Pacific Avenue entrance, as well as the introduction of new design elements in connection with the new entrance, the property has been able to remain "reasonably close" to projections. Additional innovations, including the improvement of food and beverage offerings, a marketing initiative based on the Sands slot data acquisition system, and the introduction of the first live musical buffet in Atlantic City, have begun. The "fair share" numbers for the Sands during the last 12 months, reflecting the percentage of gaming revenues enjoyed by the Sands based on the number of tables and slots, have decreased, from 95.2% to 92.2%. Nevertheless, the fair share numbers reflect only gross revenues, during the Chapter 11 reorganization, and do not reflect fully the recent improvements initiated by the new CEO.

The EBITDA projections for the year 2000 do not take into account the plans of current management, which are in process, to decrease the number of tables and to increase the number of slot machines. Several witnesses for 'both proponents agreed that the "direction of the marketplace" is to focus on slot machines, which are more profitable than gaming tables. Approximately 75% to 85% of the revenues in Atlantic City are generated from slot machines. Current management is planning to increase the number of slot machines by approximately 200, to a total of 2,200, by August 2000.

On the issue of the contemplated management for the reorganized debtors, under the former parent organization controlling the Sands, previous management had achieved some success in the early 1990's, through 1995, reaching EBITDA after management fees of approximately $37 million. Since then, the Sands has struggled through several management changes, dipping to an EBITDA of approximately $11 million in 1996, and remaining in the range of $21 million to $23 million from 1997 through 1999. The High River

---

**15.** The debtors' actual EBITDA for 1999 was    approximately $21 million.

plan contemplates the retention of present management, under the control of a new Board of Directors headed by Carl Icahn.

There is ample basis to believe that the High River plan offers a reasonable probability of success going forward. Various measurements of feasibility, including debt to cash flow, beginning cash and year-end excess cash, are favorable. The development plan formulated by the debtors, contemplating the construction of a hotel tower, the addition of public space and the addition of 800 slot machines, is sketchy, and the cash infusion is insufficient to support the projects.[16] Nevertheless, the significant cash infusion of $65 million, combined with the reduced debt obligation, will offer flexibility to the reorganized debtors to make capital improvements and to meet ongoing obligations. As well, the Icahn Group has received Interim Casino Authorization, issued May 10, 2000 by the Casino Control Commission, to operate the Sands.

### C. 1129(b) Cram Down.

Where, as here, at least one impaired class of claims has not consented to the proposed plan, the "cram down" provisions of 11 U.S.C. § 1129(b)(1) come into play. The cram down provisions require confirmation "if the plan does not discriminate unfairly, and is fair and equitable" with respect to each impaired non-consenting plan. 11 U.S.C. § 1129(b)(1). Each of these requirements as to the High River plan are reviewed herein.

### 1. Unfair Discrimination.

The concept of unfair discrimination is not defined under the Bankruptcy Code. Various standards have been developed by the courts to test whether or not a plan unfairly discriminates. *In re Dow Corning Corp.*, 244 B.R. 705, 710 (Bankr. E.D.Mich.1999). *See also* G. Eric Brunstad, Jr. and Mike Sigal, "Competitive Choice Theory and the Unresolved Doctrines of Classification and Unfair Discrimination in Business Reorganizations Under the Bankruptcy Code", 55 Bus.Law 1, 46–48 (Nov.1999) (describing various tests). The hallmarks of the various tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination. *See, e.g., In re Ambanc La Mesa L.P.*, 115 F.3d 650, 656 (9th Cir.1997), *cert. denied*, 522 U.S. 1110, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998); *In re Jim Beck, Inc.*, 214 B.R. 305, 307 (W.D.Va.1997), *aff'd*, 162 F.3d 1155 (4th Cir.1998); *In re Salem Suede, Inc.*, 219 B.R. 922, 933 (Bankr.D.Mass.1998) ("if the plan protects the legal rights of a dissenting class in a manner consistent with the treatment of other classes whose legal rights are intertwined with those of the dissenting class, then the plan does not discriminate unfairly") (quoting Kenneth N. Klee, "All You Ever Wanted to Know About Cram Down under the New Bankruptcy Code", 53 Am.Bankr.L.J. 133, 142 (1979)); *In re Crosscreek Aparts., Ltd.*, 213 B.R. 521, 537 (Bankr.E.D.Tenn.1997) ("at a minimum there must be a rational or legitimate basis for the discrimination and the discrimination must be necessary for the reorganization"); *In re Aztec Co.*, 107 B.R. 585, 590 (Bankr.M.D.Tenn.1989) (describing various tests and listing cases). Other courts apply the standard only in the context of subordinated claims or interests, *In re Acequia, Inc.*, 787 F.2d 1352, 1364 (9th Cir.1986), or require similarly situated creditors to receive their "exact aliquot distribution". *In re Greystone III Joint Venture*, 102 B.R. 560, 571 n. 16 (Bankr. W.D.Tex.1989), *aff'd*, 127 B.R. 138 (W.D.Tex.1990), *rev'd on other grounds*, 995 F.2d 1274 (5th Cir.1992).

More recently, one court has adopted a modified test for unfair discrimination, which gives rise to:

a rebuttable presumption that a plan is unfairly discriminatory ... when there is: (1) a dissenting class; (2) another

---

**16.** For instance, all witnesses, including the debtors' CEO, agreed that the estimate of $70,000 to build each hotel room is significantly below actual cost.

class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.

*In re Dow Corning Corp.*, 244 B.R. 696, 702 (Bankr.E.D.Mich.1999) (adopting the test proposed in Bruce A. Markell, "A New Perspective on Unfair Discrimination in Chapter 11", 72 Am.Bankr.L.J. 227 (1998)).

In the High River plan, the general unsecured creditors in Class 4 are scheduled to receive an estimated 80% recovery, "or such higher amount, up to 100% of the estimated total Allowed amount of such Claims, as may be determined to be consistent with section 1129(b) of the Bankruptcy Code." To avoid unfair discrimination in this case, the recovery of the Old Noteholders on their deficiency claims must be consistent with the recovery of Class 4 general unsecured creditors. We must, therefore, evaluate the value to be received by Old Noteholders on account of their deficiency claims under the High River plan.

Various valuations of the anticipated return on the deficiency claims provided in the High River plan were offered by High River, Park Place and MLAM. Although

the methodologies utilized, including the Comparable Company Analysis,[17] the Comparable Transaction Analysis[18] and the Discounted Cash Flows Method,[19] were generally similar, the range of values assigned to the anticipated returns on the deficiency claims under the High River plan by the financial advisors who testified varied a great deal, depending upon the EBITDA projections used, the multiples selected, and the estimated value of the New Notes under each respective plan.

The most credible presentation of the valuation of the return on the deficiency claims offered under the High River plan was made by the debtors' financial advisor, Chanin Capital Partners. Chanin was assigned the task of reviewing both the High River and Park Place plans for the debtors. Chanin had been the financial advisor for the debtors since March 27, 1998,[20] and was familiar with all aspects of the debtors' financial status. Chanin had access to debtors' management, and reviewed and tested debtors' projections. In contrast to other financial advisors who testified on behalf of each proponent,[21] Chanin's managing director, Steven Strom, testified that he had no present connection or expectation of future business with High River, the Icahn Group or any other party in the case.

The credibility of Chanin's analysis was enhanced by what appeared to be a more even-handed review of the two plans than

---

**17.** The Comparable Company Analysis requires a comparison of the enterprise value of selected public companies to their performance levels (EBITDA) to arrive at a benchmark multiple. Subjective assessment of how the comparable companies compare with the target company is required.

**18.** The Comparable Transaction Analysis compares the purchase price of various transactions to the companies' performance levels (EBITDA) to derive a benchmark multiple. The valuation benchmark is the trading price of a single share on a single day.

**19.** The Discounted Cash Flows analysis determines the cash flows that would be available

to a potential investor, based on a required rate of return, to determine net present value.

**20.** Chanin was retained by order entered May 1, 1998, *nunc pro tunc* to March 27, 1998.

**21.** For example, Kenneth Moelis, Managing Director of Corporate Finance at Donaldson, Lufkin & Jenrette ("DLJ"), testified that DLJ was paid $250,000 by High River for its report, with the promise of an additional $250,000 as a success fee if the High River plan is accepted. Similarly, Richard Byrne, Managing Director and Global Head of High Yield Debt Capital Markets for Deutsche Bank, testified that Deutsche Bank will be paid $500,000 for its report by Park Place.

was offered by the other financial advisors. For instance, on the Comparative Company Analysis, (labeled "Public Company Trading Multiple Analysis"), although Chanin's ultimate assessment favored High River, a higher multiple was assigned to the Park Place bid than the High River bid in recognition of the high profile of Park Place Entertainment, Inc. in the gaming industry and the greater resources available to the Sands as a part of the Park Place gaming empire.[22] As well, the Chanin valuation recognized that the New Notes issued under the High River plan may not trade at par, and may be discounted up to 10% of its face value, while Chanin assumed that the Park Place New Notes would trade closer to par, even though less debt ($110 million versus $128 million) is imposed on the reorganized debtor in the High River plan.

In addition to the three methodologies noted above, Chanin utilized an implied purchase price analysis, representing the price at which each plan proponent was attempting to purchase the Sands' equity, to test the hypothetical valuations otherwise created by application of the three methodologies, each of which considers earnings projections rather than actual performance. Chanin representative Steven Strom testified that where two real proposals are received from sophisticated, well-financed parties who are offering to purchase a meaningful percentage of the equity in a company, a review and comparison of the terms of the proposed purchases is necessary. As to the High River plan, the consistency of results between the various methodologies, including the implied purchase price of the equity, supported the reasonableness of Chanin's valuation assessment.

Park Place suggests that the credibility of Chanin's assessment is suspect because Chanin, as debtors' financial advisor, seeks to assist existing management in retaining their management roles in the reorganized debtor under the High River plan. Under the Park Place plan, at least one of the two members of the Board of Directors will be terminated. Park Place's suggestion in this regard is not supported by the record. In November 1999, when Park Place proposed a plan, debtors' management actively encouraged a bidding process, and voluntarily sought to suspend confirmation proceedings on their own stand-alone plan, even after unsecured creditors voted in favor of the plan, notwithstanding the recognition by debtors' management that the plan proposed by Park Place, with MLAM's support, called for the termination of existing management. Management did not act in its self interest then to retain their respective position. There is no basis to believe that Chanin was influenced by management to offer valuations based on the desire of current management to retain their positions.

To value the recovery under the High River plan on the Noteholders' deficiency claims, Chanin utilized the debtors' revised cash flow projection as of January 2000, projecting an EBITDA for the year 2000 of $32.473 million. Multiples in the range of 4.5 to 5.5 were used, producing an enterprise value in the range of $146 million to $179 million. The implied purchase price analysis reflected that High River was purchasing 46.25% of the stock for $14.05 per share. The "Chanin reference range", combining all four methodologies, predicted the price range per share of stock as between $11.00 to $14.00. That range of price per share produces a recovery on the deficiency claims of the Old Noteholders of between $48.125 million to $75.250 million. The percentage recovery on the Old Noteholders deficiency claim ranges from 59.2% (with an estimated trading level of 90% on the New Notes) to 92.5% (with an estimated trading level of 100% on the New Notes). The mid-point

---

**22.** In contrast, the DLJ analysis, presented in support of the High River plan, contemplated an expected trading price for the New Notes of 85% to 95% under the Park Place plan, and 95% to 100% under the High River plan.

of the recovery, which takes into account a range of bond prices from 90% to 100% of par and a recovery range of between $11.00 and $14.00, is approximately 76%. With minor variations in the use of multiples[23] and the amount of cash available,[24] the projected recovery on the Old Noteholders' deficiency claim is relatively consistent between the assessments of Chanin, High River and DLJ. Both High River and DLJ opine that under the High River plan, the range of deficiency claim recovery will be approximately 64% to 84%, with shares of stock valued at approximately $12.50 to $15.50 per share. Coincidentally, the approximate mid-point of these valuations is 76%. Based primarily on the Chanin valuation, as supported by High River and DLJ, I conclude that the deficiency claimants are receiving a recovery under the High River plan of approximately $61.69 million, or approximately 76% of their unsecured claims.

By our calculations, the deficiency claims of Old Noteholders in Class 2 are receiving 76% of their claims, while the general unsecured claims in Class 4 are receiving 80%. While the difference is not large, the disparity is nonetheless discriminatory. The question is whether or not the difference constitutes "unfair" discrimination.

Courts which have rejected confirmation on the basis of unfair discrimination have confronted plans proposing grossly disparate treatment (50% or more) to similarly situated creditors. *See, e.g., In re Tucson Self–Storage, Inc.,* 166 B.R. 892 (9th Cir. BAP 1994) (providing for 100% for unsecured trade creditor and 10% to deficiency claim was unfair discrimination); *In re Barney & Carey Co.,* 170 B.R. 17 (Bankr. D.Mass.1994) (denying confirmation where deficiency claim was to receive 100% and general unsecured 15%); *In re Caldwell,* 76 B.R. 643, 646 (Bankr.E.D.Tenn.1987)

(confirmation denied where 100% of credit card debt was proposed to be paid but only 22.7% of all other unsecured debt would be paid). *But see In re 203 N. LaSalle St. Partnership,* 126 F.3d 955, 969 (7th Cir. 1997) (paying unsecured trade creditors 100% and bank deficiency claim 16% not unfair because it was more than the bank would have received under a Chapter 7 liquidation); *Jersey City Medical Center,* 817 F.2d at 1057 (allowing payment of 100% of physicians claims and 30% of other unsecured claims where source of repayment was an issue).

There is no bright line test which establishes whether a given difference in percentage recovery results in unfair discrimination. Under the *Dow Corning* test cited above, confirmation would be denied only if there was a "materially lower" percentage recovery for the dissenting class or a "materially greater risk to the dissenting class in connection with its proposed distribution." *In re Dow Corning Corp.,* 244 B.R. at 702. Like Judge Spector in *Dow Corning,* I adopt the test articulated in Bruce A. Markell, "A New Perspective on Unfair Discrimination", 72 Am. Bankr.L.J. 227 (1998), because the test "effectively targets the kind of discrimination or disparate treatment that is commonly understood as being 'unfair', namely that which causes injury or that unjustly favors one creditor over another." 244 B.R. at 702.

In this case, the dissenting class of Old Noteholders are not receiving a materially lower percentage recovery on their deficiency claim than the percentage recovery anticipated to be received by general unsecured creditors. The actual value being received by the Old Noteholders on their deficiency claims cannot be calculated with precision. There is substantial variation

---

**23.** High River and DLJ used multiples of 5.3 to 6.3 for the High River plan, while Chanin used a range of 4.5 to 5.5.

**24.** The High River and Donaldson Leftkin and Jarrett (DLJ) valuations utilize $18 million as cash on hand as of the effective date of the plan, while Chanin assumes $21 million of cash on hand.

among the experts who testified at trial, including those who opined that the value received on account of the deficiency claims is higher than 80%. It is sufficient for these purposes to conclude that High River has met its burden to establish that the value being received on account of the deficiency claims is not "unfair."

Nor does the allocation of equity proposed by the High River plan on account of the deficiency claims of Old Noteholders impose a materially greater risk to the dissenting class. The disparity of risk imposed upon equally situated creditors may be evaluated by comparing the levels of risk accepted prepetition by each creditor with the levels of risk imposed in the plan. 72 AM.BANKR.L.J. at 253. For instance, it is generally recognized that "[t]rade creditors have short–term maturities; debenture holders have long-term expectations." *Id.* at 252. Correspondingly, in this case, the trade creditors are receiving an immediate cash payout, while the Old Noteholders are receiving a package of securities that conform to prepetition long-term expectations. No "unfairness" is discerned in this necessary disparity in treatment.

Even if the more widely accepted tests of reasonableness and necessity for confirmation are applied, the disparity in treatment between the two classes of creditors would meet the requirement proscribing "unfair discrimination." In this case, the dissenting class of Old Noteholders is receiving all of the reorganization value of the debtors, in excess of $170 million, with a relatively minor carve-out for the cash payment of less than $6 million to trade. As noted in the classification discussion under § 1129(a)(1), the only opportunity for the proponent to offer the enterprise value of the debtors to the Old Noteholders is to offer them the equity in the reorganized debtors on account of their deficiency claim. The disparate treatment is necessary for reorganization, and the minor variation in recovery is reasonable.

██ GBHLLC also claims that the High River plan unfairly discriminates against Class 5 Intercompany Notes. However, the proscription in section 1129(b) against unfair discrimination is a "horizontal limit on nonconsensual confirmation ... assuring equitable treatment among creditors who have the same level of priority." 72 AM.BANKR.L.J. 227–228. As reflected above, the subordination agreements between the debtor and GBHLLC change the level of priority enjoyed by GBHLLC to require any distribution received on account of the Intercompany Notes to be paid to the Old Noteholders. The objection of GBHLLC is overruled.

I conclude that the High River plan does not unfairly discriminate among dissenting creditors.

### 2. Fair and Equitable.

Unlike the concept of unfair discrimination, Congress' use of the phrase "fair and equitable" is at least partly defined in the statute. Subsection 1129(b)(2) provides that "the condition that a plan be fair and equitable with respect to a class *includes* the following requirements." 11 U.S.C. § 1129(b)(2) (emphasis added). The statute offers illustrative ways to satisfy the fair and equitable standard for classes of secured and unsecured creditors, as well as for a class of interests.

As to secured creditors, section 1129(b)(2)(A) provides that the secured claimant must either (1) retain its lien securing the claim and receive sufficient deferred payments of at least the allowed amount of the claim under the plan, (2) be granted a lien that attaches to the proceeds if the collateral is sold, or (3) receive the "indubitable equivalent" of its claim. 11 U.S.C. § 1129(b)(2)(A). *See, e.g., In re Ambanc La Mesa L.P.,* 115 F.3d 650, 653–54 (9th Cir.1997), *cert. denied,* 522 U.S. 1110, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998) (applying factors); *In re Arnold & Baker Farms,* 85 F.3d 1415, 1420 (9th Cir.1996), *cert. denied,* 519 U.S. 1054, 117 S.Ct. 681, 136 L.Ed.2d 607 (1997) (same); *In re Briscoe Enters. Ltd., II,* 994 F.2d

1160, 1168 (5th Cir.1993), *cert. denied*, 510 U.S. 992, 114 S.Ct. 550, 126 L.Ed.2d 451 (1993). The first example in effect substitutes a new loan for the previous indebtedness, in the amount of the allowed secured claim, with a replacement lien against the property, and with payments going to the secured claimant going forward, adjusted for present value.

Under High River's proposed plan, the Class 2 Old Noteholder claimants will retain their lien securing the claim, and will receive deferred payments of at least the allowed amount of the claim. On account of their allowed secured claim, they will receive New Notes, at the slightly higher interest rate of 11% (compared to 10–7/8% on the Old Notes) to the extent of the appraised value of the collateral ($110 million).

■ With respect to unsecured claims, § 1129(b)(2)(B) provides that a dissenting class of unsecured creditors may be crammed down if the plan does not offer a junior claimant any property before each unsecured claimant receives full satisfaction of its allowed claim. 11 U.S.C. § 1129(b)(2)(B). This portion of § 1129(b) is often referred to as the "absolute priority rule". *See Bank of America National Trust & Savings Ass'n v. 203 North LaSalle St. Partnership*, 526 U.S. 434, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999). The Class 4 unsecured creditor class has voted in favor of the High River plan. To the extent that Class 2 represents a class of dissenting unsecured claimants who are not receiving full satisfaction of their claims under the High River plan, there is no violation of the fair and equitable requirement because the plan does not propose to make a distribution to any junior claimant.

I conclude that the High River plan meets all of the § 1129 requirements, and is confirmable.

## II. *The Park Place Plan.*

Park Place offers a competing plan. Park Place, the largest gaming company in the world, owns, manages or has an interest in 28 gaming properties in six states, five countries and one cruise line, and has experienced great success in operating profitable hotels and casinos worldwide. Incorporated in June 1998, the company acquired the gaming business of the Hilton Hotels Corporation and the Mississippi gaming business of Grand Casinos, Inc. in December 1998. In 1999, Park Place opened the Paris Casino Resort in Las Vegas, Nevada, and completed the acquisition of Caesars World, Inc., with ten properties worldwide, for a purchase price of $3 billion. In Atlantic City, Park Place owns and operates three casinos, including Bally's Park Place, the Atlantic City Hilton and Caesars Atlantic City.

To implement its plan, Park Place proposes to buy 5,769,200 shares of the newly issued equity of Holdings for $40 million in cash, $30 million of which will be earmarked for capital improvements. Park Place has also agreed to make an exchange option available to holders of Old Notes who would prefer to hold debt securities rather than equity. Under the exchange option, any holder of Old Notes may elect to exchange with Park Place the equity securities such holder would receive under the plan for the New Notes that Park Place would receive under the plan, at a predetermined exchange rate of $3.61 per share. Merrill Lynch has agreed to elect the option and will exchange all of the equity it would receive for New Notes. As a result, Park Place will own between 80–100% of the equity of reorganized Holdings, depending on the number of Old Noteholders who elect the option.[25]

Under the Park Place plan, the Old Noteholders will receive a pro rata portion

**25.** At trial, Vincent J. Intrieri, a portfolio manager at Icahn Associates, Inc., testified that although the Icahn group voted to reject the Park Place plan, the group elected to exercise the exchange option, leaving Park Place with at least 94% of the equity in the reorganized debtors, if the Park Place plan is confirmed.

of $128 million in New Notes and 4,230,800 shares (42.3%) of the New Common Stock (subject to the election of the Park Place exchange option by the holders of Old Notes). Ruth Lubin's secured claim is treated in the same manner as in debtors' stand-alone plan. General unsecured creditors will receive up to 100% of their allowed claims, as permitted under 11 U.S.C. § 1129(b).

The Intercompany Notes will receive $350,000 in New Notes, from the New Notes that would otherwise have been allocable to Park Place. Other subordinated claims and Old Common Stock interests, which will be canceled and extinguished, will receive no distribution.

In connection with the acquisition of Caesars World, Inc. in December 1999, Park Place acquired a seven-acre parcel of real estate that fronts on the Atlantic City boardwalk, and separates the Sands from the boardwalk, known as the "Traymore Site". Park Place provides in its plan that it intends to develop this property, either as a separate facility or as a combined site with the Sands. Although such development would be designed to enhance the Sands' patronage and revenues, "such development is not a certainty", and Park Place's assumptions and projections were developed without consideration of a combined development on the Traymore site.

For compliance by the Park Place plan with § 1129 requirements, we *focus on* § 1129(a)(2), (a)(3), (a)(10), (a)(11) and § 1129(b). As to § 1129(a)(1), the Park Place classification scheme is the same as the High River plan, is not violative of Title 11 requirements and may be sustained as presented.

A. *Section 1129(a)(2).*

Section 1129(a)(2) requires that:

The proponent of the plan complies with the applicable provisions of this title.

11 U.S.C. § 1129(a)(2). The accompanying legislative history of this subsection makes special mention of compliance with the disclosure requirements mandated in 11 U.S.C. § 1125. H.R.Rep. No. 595, 95th Cong., 1st Sess. 412 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 126 (1978).

■ On the issue of the compliance by Park Place with the applicable provisions of Title 11, High River contends that Park Place violated provisions in several instances, including improper contact with the Class 3 creditor, Ruth Lubin, improper employment solicitation of a member of the Sands management team, improper contact with the Official Committee of Unsecured Creditors and their professional, and violation of a court order regarding sealed ballots. Each circumstance will be reviewed below.[26]

1. Park Place is charged by High River with using "heavy-handed tactics" and duress to convince Ruth Lubin, the sole Class 3 creditor, to vote in favor of the plan. High River claims that, "upon information and belief", Clive S. Cummis, the Executive Vice–President of Law and Corporate Affairs and the Corporate Secretary of Park Place, made a personal visit to Ms. Lubin to seek her affirmative vote, and improperly discussed Ms. Lubin's daughter's employment at Caesars, a property which is also owned by Park Place.

The deposition of Ms. Lubin was taken on June 15, 2000. There is no support for the concerns expressed by High River. Ms. Lubin had a telephone conversation with Mr. Cummis, wherein she expressed support for the Park Place plan. She mentioned her daughter's employment with Caesars. She testified that she never felt threatened or imposed upon in any way. The objection is overruled.

2. High River contends that Park Place improperly solicited Timothy A.

26. Other concerns raised regarding the conduct of Park Place, including the hiring of a local law firm to assist in solicitation efforts, appear to be within the realm of permissible solicitation activity, with no consequences in terms of the confirmability of Park Place's plan.

Ebling, Senior Vice–President, Chief Financial Officer, and one of the two members of the Sands Board of Directors, for employment with Park Place. The solicitation took place after the debtors' management determined to support the High River plan.

Wallace R. Barr, Executive Vice–President of Eastern Operations for Park Place, acknowledged that he spoke with Mr. Ebling about future employment opportunities with Park Place. He asked about Ebling's employment contract, and proposed to him that he consider staying on at the Sands if Park Place was successful in its bid, or that he consider other Park Place employment opportunities, if Park Place was not the successful bidder. Ebling responded that he would consider the prospect.

Although "heavy-handed tactics" may be used to describe the conversation between Mr. Barr and Mr. Ebling, the discussion of future employment does not amount to a violation of any applicable provision of Title 11. The objection is overruled.

3. High River contends that counsel for MLAM, Chaim Fortgang, Esquire, of Wachtell, Lipton, Rose & Katz, made an improper contact with Samuel Star, a principal of Ernst & Young Restructuring LLC, (formerly Ernst & Young L.L.P.) the financial advisors and accountants to the Official Committee of Unsecured Creditors. During the time frame that solicitation letters from various parties in interest were being drafted, Mr. Fortgang called Mr. Star with regard to a draft of the solicitation letter of the Unsecured Creditors Committee. Apparently, Wachtell Lipton had retained the firm one or two weeks earlier in another matter.[27] According to Star's deposition testimony,[28] Mr.

Fortgang suggested to him that he review the solicitation letter, which referred to an independent analysis conducted by Ernst & Young, and which Mr. Fortgang believed was "wrong" in some way. Mr. Fortgang also asked Mr. Star to provide him with any "analysis" that had been prepared, and to "talk to counsel", meaning Eric Browndorf, Esquire, counsel for the Official Committee of Unsecured Creditors. Mr. Star described Mr. Fortgang as "agitated" during the conversation.

■ While there may be some consequence to Mr. Fortgang's action,[29] it does not impact on the confirmability of the Park Place plan. MLAM and its counsel were actively involved in the solicitation of Park Place to participate in the proceedings, actually drafted Park Place's plan, and have been aggressively supporting Park Place's plan. However, MLAM is not a proponent of Park Place's plan. Section 1129(2)(a) addresses the compliance by a proponent of a plan with the applicable provisions of Title 11. Therefore, in terms of the confirmability of Park Place's plan, the objection is overruled.

4. High River contends that Clive Cummis, the attorney member of the Park Place executive management team, improperly contacted David Goldberg, the Chairman of the Unsecured Creditors' Committee, prior to the approval of the two disclosure statements. Mr. Cummis testified at depositions that he spoke to Mr. Goldberg not as a creditor, but as "chairman of the creditors committee on a legal issue." He described the legal issue as a quest to understand why the Creditors' Committee was supporting the High River plan when, in his opinion, the Park Place offer was better. According to Mr.

---

27. A motion to reconsider the appointment of Ernst & Young Restructuring LLC was filed by the United States Trustee and is pending.

28. Park Place's objection to consideration of portions of Samuel E. Star's deposition was withdrawn by letter dated July 10, 2000.

29. The Unsecured Creditors' Committee contends that the contact by MLAM's counsel with the Committee's professional was inappropriate and unethical under *Erickson v. Newmar Corp.*, 87 F.3d 298 (9th Cir.1996). Any request for sanctions should be sought by subsequent submission.

Cummis, when Mr. Goldberg responded that "he was advised by counsel that he had to do it", Mr. Cummis determined to speak with counsel for the Committee, Mr. Browndorf.

From these facts, it is unclear whether Mr. Cummis was acting as an attorney for Park Place, in which case his conduct may be a violation of Rules of Professional Conduct 4.2, which proscribes communication by an attorney with a person represented by counsel. If Mr. Cummis was not acting as an attorney, but as a member of the Park Place management team, the facts do not support an improper solicitation prior to disclosure statement approval, but rather an informational discussion. The burden to sustain the confirmation objection, which has not been sustained as to the Cummis–Goldberg conversation, is on the objector. *In re Shortridge*, 65 F.3d 169, 1995 WL 518870 (6th Cir.1995). The objection is overruled.

5. High River and the Unsecured Creditors Committee contend that Park Place violated a court order entered April 23, 2000, which provided that the votes of unsecured creditors would be anonymous and sealed with the court. An application for the entry of the order was filed by the Creditors' Committee to protect creditors' concerns that the manner in which they voted for the two plans might impact on their business relationships with Park Place and/or entities controlled by or influenced by Park Place. The purpose of a secret ballot would be to allay creditors' concerns that their votes may initiate retribution or other negative economic consequences.

At trial, Mr. Barr, the head of operations for the three Park Place properties in Atlantic City, testified that in late May 2000, during the solicitation period of the plan, he was advised by counsel that a large number of unsecured creditors were voting in favor of the High River plan and against the Park Place plan. This information was inconsistent with the information he was receiving from vendors he was

in touch with. He called four large vendors, and asked another member of his senior management team, John Wallis, Vice–President of Purchasing for the three Atlantic City properties, to contact other vendors, "to confirm that they were voting for us or if they hadn't to, I guess, potentially change their vote, if that was possible." He acknowledges that he requested the vendors "to send me a copy of their ballot, just for our records, so if in case there was a discrepancy that we had some documentation." He received two ballots back. He testified that when he asked for copies of the ballots, he was not aware of any court restrictions regarding such a request. When he was subsequently advised to discontinue the request to vendors, he did so.

John Wallis testified at his deposition that he asked ten vendors to send him copies of their ballots, and that four of the vendors did so.

The direction of Mr. Barr and Mr. Wallis to creditors to forward copies of their ballots to Park Place was clearly in violation of this court's April 23, 2000 order. The order provided that "the votes of the creditors shall be anonymous and sealed with the court, subject to review by the United States Trustee, and subject to request for disclosure, upon a showing of cause." Mr. Barr's protestation that he was not aware of the order is of no consequence, since he acted in the course of his employment for Park Place and is charged with knowledge of the order in that capacity.

The transgression is of serious concern, and does implicate the confirmability of Park Place's plan. Compliance with a court order issued in furtherance of the reorganization process is mandated by § 1129(a)(2). Some courts have construed section 1129(a)(2) strictly, denying confirmation for any violation of the Bankruptcy Code. *In re Landing Assocs., Ltd.*, 157 B.R. 791, 810 (Bankr.W.D.Tex.1993). *See, e.g., Cothran v. United States*, 45 B.R. 836,

838 (S.D.Ga.1984) (denying confirmation because of debtor's violation of § 363(c)(2), spending cash proceeds from sale of collateral without court permission); *In re Lapworth,* No. 97–34529DWS, 1998 WL 767456, *3 (Bankr.E.D.Pa. Nov. 3, 1998) (debtor's violation of 502(b), making post petition interest payments to unsecured creditor, not cured or disclosed in disclosure statement, prevented confirmation under § 1129(a)(2)); *In re Keiser,* 204 B.R. 697 (Bankr.W.D.Tex.1996) (debtor's failure to attend 341 meeting of creditors violated § 1129(a)(2)); *In re Wermelskirchen,* 163 B.R. 793 (Bankr.N.D.Ohio 1994) (debtor's failure to include all creditors in his schedules violated § 521(1) and thus 1129(a)(2)).

The strict construction of § 1129(a)(2) employed by some courts is sometimes tempered by other considerations:

> Bankruptcy courts ... have refused to deny confirmation of chapter 11 plans based on mere technical or trivial violations of confirmation requirements. One court explained that minor violations of § 1129(a)(2), ought not be viewed as "a 'silver bullet' to kill th[e] Plan," ... [because] "Congress did not intend to fashion a minefield out of the provisions of the Bankruptcy Code ... [I]f Congress had meant that any infraction, no matter how early on in the case, no matter how minor the breach, and regardless of whether the court has remedied the violations, should result in a denial of confirmation, Congress would have given some clearer indication in the legislative history or made the statutory provision far more express."

*In re Dow Corning Corp.,* 244 B.R. 721, 734 (Bankr.E.D.Mich.1999) (quoting *In re Landing Assocs., Ltd.,* 157 B.R. 791, 810–11 (Bankr.W.D.Tex.1993)). Nonetheless, "serious violations of the Bankruptcy Code by a [proponent] can and should result in a denial of confirmation of a plan under § 1129(a)(2)." *In re Landing Assocs., Ltd.,* 157 B.R. 791, 810 (Bankr.W.D.Tex. 1993).

Park Place's violation of the April 23, 2000 court order was not technical or trivial, particularly because the violation concerned a central focus of this case, i.e., the assessment of the preferences of creditors through the voting process. Park Place was attempting to achieve the affirmative vote of the Class 4 trade creditors, which was perceived by both proponents to be essential for § 1129(a)(10) purposes. At a minimum, Park Place was attempting to block the acceptance of the High River plan by Class 4. Park Place's blatant disregard for the court order should meet with an appropriate sanction, which will subsequently be considered. However, it must be noted that the potentially sanctionable conduct of Park Place did not alter the outcome of the voting process. The Class 4 general unsecured creditors voted overwhelmingly to support the High River plan. There was no practical effect of the conduct on the plan confirmation process. The violation will not result in a denial of the confirmability of the Park Place plan under § 1129(a)(2).

### C. *Section 1129(a)(3).*

Section 1129(a)(3) requires that:

> The plan has been proposed in good faith and not by any means forbidden by law.

11 U.S.C. § 1129(a)(3). The Code does not define "good faith" in the § 1129(a)(3) context.

Courts have found a plan to be proposed in good faith where it: (1) fosters a result consistent with the Code's objectives, *In re Block Shim Dev. Company–Irving,* 939 F.2d 289, 292 (5th Cir.1991); *In re Madison Hotel Assocs.,* 749 F.2d 410, 425 (7th Cir.1984); *In re Resorts Int'l, Inc.,* 145 B.R. 412, 469 (Bankr.D.N.J.1990); (2) has been proposed with honesty and good intentions and with a basis for expecting that reorganization can be effected, *In re Koelbl,* 751 F.2d 137, 139 (2d Cir.1984); *In re Sound Radio, Inc.,* 93 B.R. 849, 853 (Bankr.D.N.J.1988), *aff'd in part, remand-*

ed in part, 103 B.R. 521 (D.N.J.1989), aff'd, 908 F.2d 964 (3d Cir.1990), or (3) is supportable based on the totality of the circumstances. *In re Cajun Elect. Power Co-op., Inc.,* 150 F.3d 503, 519 (5th Cir.1998) cert. denied, 526 U.S. 1144, 119 S.Ct. 2019, 143 L.Ed.2d 1031 (1999); *Beal Bank, S.S.B. v. Waters Edge L.P.,* 248 B.R. 668, 688 (D.Mass.2000); *In re Holley Garden Aparts., Ltd.,* 238 B.R. 488, 493 (Bankr. M.D.Fla.1999).

■ The activities of Park Place described above in connection with § 1129(a)(2), the requirement that the plan proponent comply with applicable Title 11 provisions, overlap somewhat with good faith concerns under § 1129(a)(3). However, the focus of the good faith requirement is whether the plan under consideration advances the reorganization objectives of Chapter 11 of the Bankruptcy Code, in a manner that can be effected and is otherwise supportable. On this record, I conclude that the Park Place plan is in conformance with Chapter 11 reorganization goals, is proposed in good faith and not by any means forbidden by law.

D. *Section 1129(a)(10).*

■ Section 1129(a)(10) of the Bankruptcy Code requires that:

If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

11 U.S.C. § 1129(a)(10). This section is designated as a "critical confirmation requirement" which is necessary to avoid the construction by a plan proponent of a classification scheme "designed to secure approval by an arbitrarily designed class of impaired claims even though the overwhelming sentiment of the impaired creditors was that the proposed reorganization of the debtor [or other proponent] would not serve any legitimate purpose." *John Hancock Mutual Life Insurance Co. v. Route 37 Business Park Assocs.,* 987 F.2d

at 158. *See also In re Bryson Properties, XVIII,* 961 F.2d 496, 501 (4th Cir.), cert. denied, 506 U.S. 866, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992); *In re Willows Convalescent Ctrs., L.P.,* 151 B.R. 220, 224 (D.Minn.1991); *In re 499 W. Warren St. Assocs., L.P.,* 151 B.R. 307, 310 (Bankr. N.D.N.Y.1992);

Two classes, Class 3 (Ruth Lubin) and Class 5 (Intercompany Notes), voted to accept the Park Place plan. The opportunity of each of these classes to qualify as an impaired accepting class for section 1129(a)(10) purposes is challenged by High River.

The sole creditor in Class 3, Ruth Lubin, holds a mortgage on a parcel of property owned by the Sands, located several blocks from the casino, which is used for storage and for vehicle retention. Ms. Lubin is owed approximately $400,000, which is payable monthly over a 13–year period.

The classification and treatment of the Lubin Mortgage in the Park Place plan is the same as the treatment of the claim by the debtors in their original stand-alone plan. Both High River and Park Place adopted the classification and treatment of the Lubin Mortgage from the debtors' stand-alone plan. At the time of the confirmation hearings, High River amended its plan to reflect that the Lubin claim will be treated as unimpaired.

In the Park Place plan, at the proponent's option, the Lubin mortgage will either be paid in full, will receive deferred cash payments with a retention of the lien, will receive possession of the collateral or will be treated in accordance with an anticipated agreement between the proponent and the secured creditor. As of the confirmation hearings, no agreement had yet been reached with Ms. Lubin.

Although the Lubin claim is not "meaningful" in an economic sense, in terms of the debtors' financial statements or the opportunity of Park Place to pay the claim, Scott LaPorta, Chief Financial Officer for Park Place, testified that Park Place was

interested in resolving the claim because any future financing activity may implicate the mortgage in question. A payoff of the mortgage may facilitate such future transactions.

High River contests the qualification of Class 3 as an accepting impaired class on the ground that Park Place artificially impaired Class 3 to "manufacture an accepting impaired class of claims," thus gerrymandering the vote "to counter the overwhelming rejection of the Park Place plan by the other creditors." High River's contention is based on the premise, that is not factually disputed, that Park Place could easily accommodate the Lubin mortgage and leave the class unimpaired. According to High River, without sufficient economic justification to impair a class, the class is invalidly impaired and cannot qualify as an impaired accepting class.

Under 11 U.S.C. § 1124, a class of claims is "impaired" under a plan of reorganization unless, with respect to each claim in the class, the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest", or cures a default and leaves such legal, equitable, and contractual rights otherwise unaltered. 11 U.S.C. § 1124.[30] "The concept of 'impairment' was engrafted into § 1129(a)(10) in 1984 in an attempt to engender in the reorganization process a greater degree of consensus by mandating the affirmative vote by a class of claimants whose rights were altered under a plan of reorganization." John R. Clemancy and Nancy J. March, "Artificial Impairment and the Elusive Accepting Impaired Class

in Single Asset Chapter 11 Bankruptcies", 12 AM.BANKR.INST.J. 21 (Oct.1993).

The leading case denying confirmation on the basis of artificial impairment is the Eighth Circuit's decision in *In re Windsor on the River Assocs., Ltd.,* 7 F.3d 127, 132 (8th Cir.1993). In *Windsor,* the Eighth Circuit considered whether any alteration of a creditor's rights, no matter how minor, constituting an impairment for section 1124 purposes, "may be manufactured at the will of the debtor 'just to stave off the evil day of liquidation.'" *Id.* The court determined that where the impairment "arises solely from the debtor's exercise of discretion," *Id.* at 132, with no "plausible alternative explanation" for the impairment other than "to ensure approval by at least one 'impaired' class as required by section 1129(a)(10)", the claim is not impaired. *Id.* at 133. *See also Beal Bank, S.S.B. v. Waters Edge L.P.,* 248 B.R. 668, 690–91 (D.Mass.2000) (§ 1129(a)(10) is not satisfied unless creditors' rights are "legitimately impaired" for a proper business purpose.)

Other courts have rejected the "artificial" impairment doctrine, finding no such provision in the statute, and criticizing the notion as "essentially writ[ing] 1129(b) out of the Code in the context of single asset debtors ... [A] dominant secured creditor [can] veto a plan irrespective of whether that creditor is treated in accordance with the requirements of § 1129(b)." John R. Clemancy and John A. Harris, "Fight Over 'Artificial' Impairment under § 1129(a)(10): It's Time to Call it Quits", 14 AM.BANKR.INST.J. 20, 23 (Nov.1995). *See also In re Hotel Assocs. of Tucson,* 165 B.R. 470, 475 (9th Cir. BAP 1994) (A bankruptcy court need not determine the exis-

---

**30.** In 1994, in response to the case of *In re New Valley Corp.,* 168 B.R. 73 (Bankr.D.N.J. 1994), Congress amended section 1124, deleting subsection (3) which provided that where a class of creditors is paid in full, but without postpetition interest, it was unimpaired. As a result, case law examining this question after the amendment to section 1124 has generally concluded that "a class of creditors which will receive payment in full upon the effective date of the plan is impaired within the meaning of the Bankruptcy Code." *In re Atlanta–Stewart Partners,* 193 B.R. 79 (Bankr.N.D.Ga. 1996). *See also In re PPI Enterprises, Inc.,* 228 B.R. 339 (Bankr.D.Del.1998); *In re Crosscreek Aparts., Ltd.,* 213 B.R. 521 (Bankr. E.D.Tenn.1997).

tence of alternate payment structures, and a plan proponent is not required to create unimpaired classes.) The issue of artificial impairment has also been addressed in the context of the good faith of a plan under § 1129(a)(3). *See, e.g., In re 203 North LaSalle St. L.P.*, 190 B.R. 567, 593 (Bankr. N.D.Ill.1995), *aff'd*, 195 B.R. 692 (N.D.Ill. 1996), *aff'd*, 126 F.3d 955 (7th Cir.1997), *rev'd on other grounds*, 526 U.S. 434, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999).

█ Since the passage of the 1994 amendment to § 1124 (see n. 50), which confirmed that even a class of creditors receiving full cash payment on the effective date of the plan is impaired, and may therefore vote as an impaired accepting class for § 1129(a)(10) purposes, the concept of artificial impairment is much more difficult to justify. *In re Atlanta–Stewart Partners*, 193 B.R. 79 (Bankr.N.D.Ga. 1996). I join the courts which have followed *Atlanta–Stewart* to conclude that "a claim need not and cannot be artificially impaired." John R. Clemancy and Glenn A. Saks, "Even an Act of Congress Can't Stop the Fight Over Artificial Impairment", 17 AM.BANKR.INST.J. 18, 25 (Nov. 1998). *See, e.g., In re Crosscreek Aparts., Ltd.*, 213 B.R. 521, 536 (Bankr.E.D.Tenn. 1997). There is no ambiguity in the statute. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241–42, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989). Under the statutory scheme for the classification and treatment of claims, a plan proponent may impair a class of claims. If an impaired class accepts the plan, the requirement of section 1129(a)(10) is satisfied. Of course, the classification and treatment of classes of claims is always subject to the good faith requirements under § 1129(a)(3).

In this case, there is no question that each of the four possible treatments of the Lubin claim, including a cash payout, deferred payments, surrender or agreement, constitute an impairment of the claim. The impairment was utilized by all three plan proponents (the debtors, High River and Park Place). There is no implication of lack of good faith in proposing the impairment. Ms. Lubin has voted to accept the Park Place plan. Class 3 qualifies as an impaired accepting class.

In light of this conclusion, we need not evaluate the challenge to Class 5 for section 1129(a)(10) purposes.

### E. *Section 1129(a)(11).*

█ As with the High River plan, there is ample basis to believe that the Park Place plan offers a reasonable probability of success going forward. The capital structure, including $128 million of debt and a $40 million cash infusion, is adequate to meet the debtors' needs.

The greatest strength of the Park Place plan is the opportunity of the Sands to avail itself of a proven, highly successful management team. As noted above, Park Place is the largest gaming company in the world, with the highest gross gaming revenues, the highest EBITDA, and the highest rating among gaming companies by most other financial and/or operational measurements.

As a member of the Park Place organization, the Sands would no doubt achieve benefits such as the consolidation of management functions, the enhancement of marketing opportunities, and the achievement of cost synergies throughout its operations. The Sands would also have access to the amenities located at the other three properties, including a newly renovated golf course in Atlantic City, the spa at Bally's Park Place, and restaurant and entertainment opportunities. These amenities would be available to the Sands at fair market value, on a per use basis, in the same manner that the other properties use the facilities.

According to Park Place, the significant management opportunities available to the Sands as a part of the consolidated Park Place organization prompted Park Place to project an increase in EBITDA during the first year of its operations from $21 million in 1999 to $46 million, before management

fees, during the first year of operations. The formulation of these numbers, as well as the prospect of achieving the projections, will be discussed below, in the context of the value being achieved through the Park Place plan by Old Noteholders on both their secured and unsecured deficiency claims. For feasibility purposes herein, Chanin, in evaluating the feasibility of the Park Place plan, adjusted the Park Place projections, incorporating substantial cost savings by reason of the synergies with other Park Place facilities. After management fees of approximately $1.5 million, the EBITDA projected by Chanin is approximately $32.9 million. Even with the adjustments, all measurements of financial feasibility, including debt to cash flow and excess cash, confirm the reasonable probability of success for the Park Place plan.

The primary point of concern regarding the feasibility of the Park Place plan is the opportunity of Park Place to achieve licensure for the reorganized debtors from the Casino Control Commission ("CCC"). Under New Jersey law,

> No person shall be issued or be the holder of a casino license if the issuance or the holding results in undue economic concentration in Atlantic City casino operations by that person.

N.J.S.A. 5:12–82(e). When Park Place applied in 1999 for approval to acquire a casino license for the Caesars property in Atlantic City, the focus of the CCC was whether the issuance of the additional casino license for Caesars to Park Place would constitute undue economic concentration under N.J.S.A. 5:12–82(e). In its opinion, issued on November 3, 1999, the CCC observed that after the acquisition, Park Place "will have or be tied for the largest market share [in Atlantic City] in all but one of the regulatory categories" The Herfindahl–Hirschman Index (HHI), which is an anti-trust tool adopted by the United States Justice Department and the Federal Trade Commission to measure economic concentration in those markets where mergers are occurring, indicated that after the Caesars acquisition by Park Place, Park Place would be in the "highly concentrated range" and the casino space HHI would rise by over 200 points. The federal merger guidelines urge extreme caution if a merger even in a moderately concentrated market causes a 100 point increase in the HHI. Nevertheless, the CCC reflected that numerical figures are not determinative, and that other factors, including new competition anticipated to enter the Atlantic City marketplace and sufficient competition from other Atlantic City casinos even before expansion, justify the conclusion that licensure will not result in undue economic concentration. The license was approved, with a cautious note that "further expansion by all market players, especially those with multiple properties, will warrant close Commission scrutiny."

It is certainly difficult to speculate about the prospects for licensure by Park Place in connection with the proposed acquisition of the Sands. Park Place contends that if their plan is confirmed by the bankruptcy court, the CCC will not reject licensure for Park Place in light of the significant economic opportunity for the Sands to reorganize and maintain its economic viability. Indeed, the CCC, in its opinion, reflected that "encourag[ing] new capital investment" in Atlantic City is an important legislative policy which must be balanced against competing policies such as the fostering of economic competition in the market place. *See* N.J.S.A. 5:12–1(b)(13). I note as well the announcement of the groundbreaking in September 2000 for a new 2,000 room casino hotel by a Mirage–Boyd Gaming Group joint venture, scheduled to be completed in 2003, with prospects for two additional large casinos to be built within the next several years. I conclude that for section 1129(a)(11) purposes, there is a reasonable prospect of success for Park Place to achieve licensure to own and operate the Sands in the event of the confirmation of the Park Place plan.

F. *1129 (b) Cram Down.*

As with the High River plan, because two impaired classes of claims have not

consented to the Park Place plan, the "cram down" provisions of 1129(b)(1) must be reviewed, including whether the plan discriminates unfairly, and whether the plan is fair and equitable.

### 1. Unfair Discrimination.

■ To determine whether the Park Place plan unfairly discriminates, the recovery of the Old Noteholders on their deficiency claim must be valued, and then compared with the recovery of Class 4 general unsecured creditors. As with the High River analysis, the Chanin Capital Partners valuation is most credible. Other valuations, including those offered by Deutsche Bank, MLAM and Park Place, are less persuasive in establishing valuation calculations.

For instance, the Deutsche Bank report specified that it did not independently verify any information in the report, and "expresses no view as to the reasonableness of such forecasts and projections or the assumptions on which they are based." Although Richard Byrne, testifying in behalf of Deutsche Bank, described the language in the report as a "standard disclaimer," the Deutsche Bank team creating the report had limited opportunity to review Park Place's new projections, which they received in early March 2000. The Deutsche Bank report was issued on March 31, 2000, and accepts all Park Place projection numbers without alteration. The Deutsche Bank team had no contact with Sands management, and no knowledge of new initiatives at the Sands, including a new CEO as of November 1999. Although Mr. Byrne opined, from the Deutsche Bank report, that the value of the shares of stock received on the deficiency claim of Noteholders at confirmation would be in the range of $11.76 to $16.26 per share, he did not believe that Park Place's opportunity to purchase over 57% of the shares of stock issued at $6.93 per share was inconsistent with the Deutsche Bank opinion, because the price of the stock would "magically" increase in value on the basis of "Park Place's ability

to generate a higher return." A serious discrepancy was also noted in the Deutsche Bank report regarding a listing of the current share price of comparable companies, which were all noted as of April 18, 2000. However, all of the share prices were actually as of June 8, 2000, except the share price of the Stratosphere, a company owned by the Icahn interests, which had a share price as of April 18, 2000, at a value significantly less than the June 8 share price. These factors compromised the credibility of the Deutsche Bank report.

Similarly, the valuation calculations offered by MLAM, and its opinion that the Park Place plan offers a greater recovery than the High River plan, were largely discredited for several reasons. First, Michael Brown, a Senior Credit Analyst and Vice-President at MLAM, offered valuation assessments and opinions based on "a gut feel", and "gut instinct". Although he had access to and reviewed debtors' ongoing performance, he testified that he had no communications in recent months with the debtors' management, including their new CEO, and had "no idea" whether the debtor was ahead or behind on its projections for the year. Second, Mr. Brown's adversarial involvement with the Sands management throughout the case weakened the MLAM presentation. There is no question that Mr. Brown and MLAM are sophisticated investors who were motivated throughout the case by a desire to maximize the return to MLAM. Nevertheless, Mr. Brown acknowledged that at various times, from the commencement of the bankruptcy case, he had "some agitated interactions" with management, and told management that he "wanted it [the reorganization case] to go my way." At times, he disagreed with the decisions of the debtors' management, including the decision to move before the bankruptcy court for termination of the management contract with New Jersey Management, Inc. and the decision to submit a stand-alone plan that proposed to distribute the debt-

ors' equity to Old Noteholders. Third, MLAM's assessment that the Park Place plan offers a greater recovery than the High River plan is suspect in light of the fact that MLAM committed itself to support the Park Place plan prior to the presentation of the High River plan, at a time when the debtors' stand-alone plan, subjecting MLAM to grave regulatory concerns, was the only other option available.

The Park Place valuations must also be discounted in large part, because they are based on inflated and unrealistic EBITDA increases for the reorganized debtors during the first 12 months of post-confirmation operations, from $21 million in 1999 to over $46 million before management fees. The manner in which these forecasts were developed by Park Place, as well as the underlying assumptions, reflect negatively on the achievability of the projections.

When both the High River and Park Place plans were submitted on January 18, 2000, both plans relied on debtors' initial projections for FY 2000.[31] Park Place adjusted debtors' original projection of $30 million to $32 million, for anticipated cost savings in synergies and management fees. The amended plan submitted by Park Place on February 18, 2000, did not revise the projections. When High River increased its bid to $65 million for 46.25% of the equity in order to sustain an increased payment to unsecured creditors, Park Place reacted by raising its projections to meet the higher bid of High River. In a memorandum dated February 24, 2000, Scott LaPorta, Park Place's Chief Financial Officer, wrote to Wallace Barr, head of Park Place Atlantic City properties, that

> we need to revise the Sands forecast used in the bankruptcy court analysis. The Icahn team has recently submitted a much more aggressive plan. As such, we have taken a look at revising our numbers based on a fair share analysis, which is attached for your review and

comment. .... [T]hese forecasts are being used for valuation purposes and to compare our plan to Icahn's. We will not be held to them.

On February 29, 2000, LaPorta communicated with the members of the Park Place executive management team to propose an increase in Park Place's equity contribution from $30 million to $40 million, and to present the revised forecast for the Sands post-confirmation EBITDA performance, which was projected to increase from the original plan presentation of $36 million before management fees, to $46.7 million before management fees. LaPorta also informed the management team that he had successfully negotiated with MLAM "to reduce the EBITDA/interest coverage ratio covenant from 2.5x to 2.0x for calculation of the overall dividend pool and eliminated the 50% of net income maximum dividend covenant." This meant that when the company reached approximately $28 million in EBITDA, Park Place could begin to dividend monies back to its shareholders, and Park Place would receive at least 80% of that dividend. As to return on investment, the memorandum noted that

> [T]he projections are based on a capital expenditure level of $30.0 million. The additional $10.0 million serves to aesthetically improve our proposal and would be available for working capital, buy-in a portion of the bonds, or be returned to us through the dividend payments.

The substantial projected EBITDA increase at the Sands during the first 12 months of Park Place's plan is premised largely on the addition of 200 slot machines on the Sands gaming floor, generating $230 per machine per day, or $15 million in additional gross revenues. However, the numbers are based on the unsupportable assumption that, as of the effective date of the plan, new slot machines would be installed, with players on hand to

---

**31.** The debtors initially projected EBITDA for FY 2000 at $30.016 million. Following the arrival of a new CEO in November 1999, and the introduction of certain cost savings, the projections were revised to $32.473 million.

achieve an immediate enhancement in gross revenues. Putting aside the time needed by Park Place to apply for and achieve licensure from the Casino Control Commission, the recognition that time is needed to acquire and install machines, even with Park Place's opportunity to acquire machines promptly,[32] to meet regulatory requirements, and to enhance marketing efforts to increase patronage, defeats Park Place's underlying assumption that such an enormous increase could be achieved during the first 12 months of post-confirmation operations. Several witnesses, including the Sands CEO, Alfred Luciani, recognized that the Park Place projections for the Sands were ultimately achievable, but only over a longer period of time.

Park Place's aggressive projection of an immediate and substantial increase in EBITDA cannot be accepted and may be characterized as "bidding through projections", in response to an increased bid from the Icahn Group. The increase is proposed without the contemplation of substantial capital expansion of the Sands, notwithstanding the experience of other Atlantic City casino properties, such as Caesars and Atlantic City Hilton, that have substantially increased EBITDA after a significant increase in the number of hotel rooms. Of the $40 million cash infusion, only $30 million is proposed for the acquisition of slot machines and the upgrading of existing facilities. The fact that Mr. LaPorta indicated to Mr. Barr that Park Place would not be "held" to the projections further undermines the believability of the numbers.

As noted, the Chanin valuation of the deficiency recovery to Old Noteholders under the Park Place plan is most credible. Chanin utilized the debtors' revised cash flow projections as of January 2000, with an adjustment for the synergies, or cost savings, contemplated by Park Place for the first year of operations, minus the management fee proposed by Park Place, to arrive at an EBITDA for the year 2000 of $32,881,000. The cost savings, which were assumed to be $6 million per year, were applied only to the last five months of FY 2000 at a 75% run-rate, on the assumption that a Park Place plan would not be in place until August 2000, and would not be fully implemented on an immediate basis. The Chanin adjusted projections for the Park Place plan must be revised to reflect that the projections for both plans are intended to forecast the first 12 months of operations by the new owner, rather than to reflect actual performance in the year 2000. As well, a revision will be made to Chanin's assumption of a 75% run-rate. While it is recognized that many of the cost savings will require a period of time to initiate, it must also be understood that no provision has been made in the Chanin numbers for revenue enhancements available through Park Place, such as marketing programs and access to amenities, which will enhance the opportunity of the Sands operation to grow gross revenues during the first year of a Park Place operation. However, the revision of Chanin's adjusted projections for Park Place, contemplating a starting point of debtors' 12–month projections, the addition of $6 million of cost savings, minus the corresponding management fee ($38,473,000 minus a management fee of $4,021,000), producing a new EBITDA number, after management fees, of $34.5 million, is consistent with Chanin's ultimate conclusion regarding the appropriate reference range for the new stock issued under the Park Place plan, as reflected below.[33]

Chanin utilized higher multiples for the Park Place plan than for the High River

---

32. John Wallis, Vice–President of Purchasing for Park Place, testified at his deposition that a fair estimate of the time frame for acquiring new slot machines is 90 days.

33. Utilizing a projected EBITDA of $34.5 million, a range of multiples from 5.0 to 6.0, excess beginning cash of $34 million and bonds of $128 million, the range of projected share price would be $7.85 to $11.30.

plan, ranging from 5.0 to 6.0, producing an implied enterprise value in the range of $164 million to $197 million. With the addition of $34 million of excess beginning cash, less $128 million in bonds, the adjusted equity value produced a range of between $70 million and $103 million, or a per share range of $7.04 to $10.33. Taking into consideration all four methodologies, including the price to be paid by Park Place of $6.93 per share, the "Chanin reference range" predicted the price range per share of stock under the Park Place plan to be between $8.00 and $11.00. That range of price per share produces a percentage recovery on the Old Noteholders' deficiency claim under the Park Place plan ranging from 48.0% to 79.3%. The midpoint of the recovery, which takes into account a range of bond prices from 90% to 100% of par and a recovery range of between $8.00 and $11.00, is approximately 63.7%. Taking into account the fact that the New Notes issued by Park Place are likely to trade at closer to par than the High River New Notes, in light of Park Place's strong position in the marketplace, at a share price of $9.50, the deficiency recovery to Noteholders under the Park Place plan is established at 67%.

Although the Park Place plan proposes to pay unsecured creditors 100% on its claims, the plan does provide alternatively that an amount less than 100% may be paid, as "permitted by the Bankruptcy Court." Of course, the High River discussion of the legal framework for application of the principle of "unfair discrimination", *supra*, applies here as well. To avoid unfair discrimination to Class 2 deficiency claimants, in proportion to the approximation of value to be received by the Class 4 general unsecured creditors, the maximum amount of 70% may be paid to general unsecured claimants under the Park Place plan.

### 2. Fair and Equitable

As to secured creditors under the Park Place plan, as with the High River plan, the Class 2 claimants will retain their lien,

securing the claim, and will receive deferred payments of at least the allowed amount of the claim, in satisfaction of 1129(b)(2)(A) requirements.

With respect to unsecured claims, the Class 4 unsecured creditor class has voted against the Park Place plan. Neither the deficiency portion of the Old Noteholders claim, nor the general unsecured creditors, will receive full satisfaction of their claims under the plan as proposed. However, because no junior claimant is offered a distribution of any property, there is no violation of the fair and equitable requirement.

I conclude that the Park Place plan meets all of the § 1129 requirements, and is confirmable.

### III. Competing Plans.

Under § 1129(c), the court may confirm only one plan. "If the requirements of subsections (a) and (b) of this section [1129] are met with respect to more than one plan, the court shall consider the preferences of creditors and equity security holders in determining which plan to confirm." 11 U.S.C. § 1129(c). *See In re Treasure Bay Corp.*, 212 B.R. 520, 548 (Bankr.S.D.Miss.1997); *In re Holley Garden Aparts., Ltd.,* 238 B.R. 488, 495 (Bankr.M.D.Fla.1999). Beyond considering the preferences of creditors and equity security holders, the court must consider: "(1) the type of plan; (2) the treatment of creditors and equity security holders; (3) the feasibility of the plan; and (4) the preferences of creditors and equity security holders." 238 B.R. at 493. *See In re River Village Assocs.*, 181 B.R. 795, 807 (E.D.Pa.1995); *In re Sound Radio, Inc.*, 93 B.R. 849, 859 (Bankr.D.N.J.1988), *aff'd in part, remanded in part,* 103 B.R. 521 (D.N.J.1989), *aff'd,* 908 F.2d 964 (3d Cir. 1990) (court must choose plan that is the most beneficial to both the creditors and the equity holders).

The preferences of creditors is reflected in the voting results. Of the Class 2 Old

Noteholders who voted, 45% of the Old Noteholders voted in favor of the High River plan, while 55% voted in favor of the Park Place plan. While the fact that the Park Place plan is supported by a majority of the Old Noteholders is a factor in determining which plan should be confirmed, the majority view of the Noteholders is not controlling here. Of the 55% of Old Noteholders, Park Place holds about 15% of the Old Notes, while MLAM holds approximately 38%. Although MLAM is not a proponent of the plan, it subjected itself, by binding agreement, to support the Park Place plan, even before the competing High River plan was proposed. MLAM's vote to accept the plan reflects compliance by MLAM with its agreement with Park Place, and does not necessarily reflect on which plan provides better treatment for the creditors.[34]

■ The unsecured creditors voted overwhelming in favor of the High River plan. Of the creditors voting to accept or reject the High River plan, 240 out of 266 creditors voted to accept the plan, representing 93% of the claims who voted on the High River plan. Of the creditors who voted to accept or reject the Park Place plan, 89 out of 150 creditors voted in favor of the plan, holding claims of approximately 42% of the voting creditors. Of the creditors that voted to accept both plans (40 creditors holding claims of $1.2 million), more creditors preferred the High River plan (16 to 11), but a higher amount of claims favored the Park Place plan ($663,540.36 to $368,681.49). The support of the unsecured creditor class for the High River plan is certainly a factor in determining which plan to select, but, as with the Old Noteholders class, is not con-

trolling. The unsecured creditors will receive a cash payout on the effective date of the plan. Except for continued business involvement with the debtor, the unsecured creditors will not have a further stake in the reorganized debtor.

The support of Class 3 and Class 5 for the Park Place plan is less significant than the voting of Classes 2 and 4. The Class 3 claimant, Ruth Lubin, is unimpaired under the High River plan. The nature of her treatment under the Park Place plan has not been established, but will be determined upon subsequent negotiation with her. As to the Class 5 Intercompany Noteholders, under the High River plan, per their prepetition contractual arrangements with the debtor GBHC, their claim would be subordinated to the Old Noteholders and they would receive no distribution. In the Park Place plan, the Intercompany Notes would receive $350,000 in New Notes that would be allocable to Park Place on account of its Old Notes. However, the consequence to the Intercompany Noteholders of the confirmation of the Park Place plan is not substantial, because, if the Park Place plan is not confirmed by December 31, 2000, the holders of the Intercompany Notes will have the right to sell those Notes to Park Place for $300,000.

Beyond the voting results, which may be interpreted to favor each proponent in various ways, we must determine which plan provides better treatment for the creditors.[35] Under the High River plan, with the New Notes trading at 95% of par, the

---

**34.** We need not determine whether the voting of New Generation, an entity managing pension funds of entities otherwise controlled by the Icahn organization, voted independently for the High River plan.

**35.** The interests of the equity security holders under each plan are cancelled and extin-

guished. These holders are deemed to have rejected both plans. Therefore, these interest holders did not express any preferences through voting.

anticipated total recovery to Old Noteholders is 89.7%.[36] Under the High River plan, Class 4 general unsecured creditors may be paid an 80% dividend on their claims. Under the Park Place plan, with New Notes trading at 98% of par, the anticipated total recovery to Old Noteholders is 86.5%,[37] with an opportunity to pay a 70% dividend to Class 4 general unsecured creditors. The projected recoveries favor High River, notwithstanding the higher projected EBITDA and higher multiples used for Park Place, and the assumption that Park Place New Notes would trade closer to par than High River New Notes.

In addition to higher recoveries for Class 2 Noteholders and Class 4 general unsecured creditors, the High River plan is preferable in other ways. Under the High River plan, the capital structure of the reorganized debtor is less leveraged than under the Park Place plan, with $110 million of New Notes outstanding versus $128 million under the Park Place plan. At the end of the transaction, there is significantly more cash on the balance sheet ($62,684,000 under the High River plan versus $33,984,000 under the Park Place plan), offering greater flexibility to meet the uncertainties of the Atlantic City competitive environment. As well, the High River plan provides substantially greater opportunity for capital improvements, including the potential for building additional hotel rooms. The debtors' Global Development Plan, adopted conceptually by High River, contemplates expenditures of $55.5 million. Although insufficient funds are proposed for all of the planned improvements, including 200 new hotel rooms, there is a prospect that excess cash flows will be utilized for such improvements. In contrast, the Park Place plan contemplates a maximum of $30 million in capital improvements over the next two years, focusing only on upgrading existing facilities, rather than adding floor space and/or hotel rooms, a proven vehicle for improving performance at other Atlantic City properties. The absence of a management fee connected with the property promotes the financial viability of the reorganized debtor under the High River plan. Licensure is in effect to allow the plan to be effected forthwith.

In concluding that the High River plan provides for better treatment to creditors and greater financial prospects for the reorganized debtor, I am mindful of the significant gains that would enure to the benefit of the reorganized debtor under Park Place management. Park Place, since the commencement of its operations in December 1998, through the acquisition of various properties, including Caesars in December 1999, has achieved a *"Top Pick* rating" among investors and presents "a particularly compelling investment case." Park Place purportedly has credit lines "in the billions", EBITDA cash flow at approximately $1.3 billion a year, and free cash of $4 million to $5 million per year. There is no question that Park Place would offer a strong management team, with significant and successful merger experience, to the Sands.

There is also no dispute that the gaming industry has been actively consolidating in the last several years, and that consolidation produces substantial opportunities for revenue enhancements and cost savings. For instance, properties can be cross-marketed, volumes can be increased by joint marketing efforts, and costs can be reduced by consolidating and coordinating services and spreading costs over a larger base. In Atlantic City, amenities available to the Park Place properties, including a newly renovated golf course and country club, an award winning spa, and restaurant

---

**36.** High River Class 2 Recovery:

| $104,500,000 | New Notes trading at 95% |
| + 67,200,000 | 5.375 million shares of stock at $12.50 |
| $171,700,000 | 89.7% of $191,344,000 claim |

**37.** Park Place Class 2 Recovery:

| $125,440,000 | New notes trading at 95% |
| + 40,185,000 | 4,230,000 shares of stock at $12.50 |
| $165,625,000 | 86.5% of $191,344,000 claim |

and entertainment venues throughout the properties, would be available to the Sands. Additional parking facilities in the general area of the Sands may also be available.

Cost reductions would include volume discounts occasioned by greater purchasing power, and consolidation of corporate overhead costs such as human resources, legal staff, advertising and public relations departments. Insurance costs would be substantially reduced, because there would be little increase in the overall premium charged to Park Place. Other benefits would include the opportunity to access proprietary games utilized by Park Place, and to utilize Park Place data bases, particularly lists of dormant customers that are routinely exchanged among Park Place properties.

While revenue enhancements and cost savings would no doubt accompany a Park Place takeover of the Sands, I have concluded that the Park Place projections offered in the context of their plan are inflated and unrealistic, particularly within the time frame contemplated for the projections to be achieved. The projections, which predict exponential growth virtually immediately, were formulated in a very short period of time, in response to a higher bid received from the Icahn Group. The underlying assumptions upon which the projections were based were not tested by Deutsche Bank, Park Place's financial expert, which adopted the projections as proposed, with comprehensive disclaimers. The creator of the projections, Scott LaPorta, reflected that Park Place would "not be held to" the projections. The basic underlying premise of the projections, the addition of 200 new slot machines at the Sands, is already being implemented by current management.

As well, while the proposed Park Place management agreement, as amended, contemplates the payment by Park Place of the cost of the new general manager at the Sands, the manner in which costs will be apportioned to the Sands for corporate overhead and other expenses is not specified. The apportionment of costs will be at the option of Park Place, which will also control the Board of Directors of the reorganized debtors. The reorganized debtors will have two independent directors, one of whom is also an independent director of Park Place. While the actions of the Board would be subject to their fiduciary and regulatory responsibilities, a suggestion of conflict is presented between the interests of Park Place as 100% owner of the other three highly leveraged Atlantic City properties, in which Park Place has invested hundreds of millions of dollars, and the interests of the Sands, which would be a Park Place subsidiary at an ownership level of less than 100%, with a $40 million investment. This factor is only of mild interest, since adherence by the directors of the reorganized Sands to fiduciary responsibilities is assumed, and the performance of the Sands would appear on the Park Place consolidated financial statement.

Of greater concern with regard to the Park Place plan is the need for Casino Control Commission licensure. The issue of undue economic concentration will, in all probability, be a focus of such licensure proceedings. I determined that Park Place has a reasonable chance of success regarding licensure. However, putting aside the risk that Park Place would not succeed in this regard, it must be anticipated that the process of licensure will take several months to achieve, thereby delaying the reorganization process, and reducing the value received by creditors on the effective date of the plan.

As to the impact of the Traymore site, the seven-acre parcel of real estate that fronts on the Atlantic City boardwalk and extends to the Sands, Park Place has indicated its desire to develop the site in combination with the Sands. That development would certainly enhance the Sands' property, particularly if the Sands gained access to the boardwalk. However, the Traymore tract, which was acquired by

Caesars in the late 1970's, has remained undeveloped for over 20 years, and its immediate development prospects are uncertain. Park Place acknowledged that any results of the Traymore development would not be achieved for a minimum of three to four years. Such long-term prospects are too speculative to be considered in terms of the assessment of creditor returns on these two competing plans.

Significantly, there is no consistency between what Park Place is willing to pay for the equity in the reorganized debtor, and what Park Place contends would be received by investors from the transactions. Park Place contends that following the acquisition, each share of stock would be worth in the range of approximately $12 to $15 per share. But Park Place is paying only $6.93 per share, and is receiving back a portion of that payment in management fees. There is a "disconnect" between the amount per share being paid by Park Place, notwithstanding the fact that the offer is made in the context of a competitive auction environment. The contention of Park Place's expert that the stock would "magically" increase in value because of Park Place's ability to generate a higher return is too speculative a basis upon which to rely in terms of assessing the prospects for the reorganized debtor going forward. The basic premise of Park Place in support of its plan, that there will be an extraordinary increase in the value of the reorganized debtor as a consequence of the size and previous successes of the company, with minimal corresponding obligations on the part of Park Place, will not sustain a conclusion that the Park Place plan should succeed here over the High River plan, which presents a more consistent and substantial purchase offer of $14.05 per share, and a more solid and certain capital structure going forward.

For the reasons advanced, I conclude that the High River plan shall be and is hereby confirmed. Debtors' counsel is instructed to submit an order in conformance herewith.

## Schedule A
### HIGH RIVER PLAN

|  | Acceptances | | Rejections | |
|---|---|---|---|---|
|  | Number | Amount | Number | Amount |
| Class 2—Old Notes | 15 | $ 80,291,000 | 12 | $97,271,000 |
| Class 3—Lubin Secured Claim |  |  | 1 | $ 400,000 |
| Class 4—General Unsecured Claims | 240 | $ 4,270,643.46 | 26 | $ 338,559.91 |

### PARK PLACE PLAN

|  | Acceptances | | Rejections | |
|---|---|---|---|---|
|  | Number | Amount | Number | Amount |
| Class 2—Old Notes | 29 | $ 97,915,000 | 9 | $80,072,000 |
| Class 3—Lubin Secured Claim | 1 | $ 400,000 |  |  |
| Class 4—General Unsecured Claims | 89 | $1,695,599.49 | 150 | $ 2,327,658.32 |

Class 5—Intercompany
Notes                    2      $  18,462,375